[Philadelphia, February 20, 1841.]

## SIMPSON and Another *against* HAND and Another.

1. It is an undoubted rule that for a loss arising from mutual negligence, neither party can recover in a court of common law.

2. And this rule governs the case of shippers of goods on board of vessels which have come into collision, to the injury of the goods, as well as the owners of the vessels themselves.

3. An action cannot be maintained, therefore, by the owner of goods on board of a vessel, against the owners of another vessel to recover damages for an injury done to the goods by the collision of the two vessels; if there have been mutual negligence in the conduct of those who have had the vessels in charge.

4. In an action to recover damages for injury done to goods on board of a vessel while she was lying at anchor in the river Delaware, by a vessel coming up the river in the night time, it was held that if the anchored vessel was moored in the channel without a visible light burning at the time, or if her watch was not on deck, and did not do what was customary for the purpose of avoiding a collision, there was such negligence as to bar the action, though there might have been negligence on the other side; and that the burthen of proof lay upon the plaintiff.

This was an action on the case brought in this court by M. H. Simpson and G. Harrison Otis, trading under the firm of Simpson & Otis, against Joseph Hand and Rowland Johnson.

The plaintiffs were the owners of certain goods which had been shipped at Philadelphia on board of a schooner called the Thorn, to recover damages from the defendants, who were the owners of a brig called the William Henry, for injury done to these goods by the William Henry's running into the Thorn, while the latter was lying at anchor in the river Delaware, about one o'clock in the morning of the 27th of November, 1832.

On the trial before KENNEDY, J., at a court of Nisi Prius, held at Philadelphia on the 17th of November, 1838, it was proved that the collision took place, and that damage to the Thorn and her cargo ensued.

(Simpson *v.* Hand.)

There was contradictory testimony in respect to some of the material facts of the case, but as the substance of the evidence is given in the opinion of the court, it is not necessary to state it here.

The defendants contended that the misfortune was wholly attributable to the negligence or misconduct of the master and crew of the Thorn; and specified the following items of negligence or misconduct, and produced persons for the purpose of sustaining them.

1. That the Thorn was anchored in the channel, which it was conceded was an improper position.

2. That she lay at anchor without hanging out a light.

3. That she lay at anchor without an anchor watch, who could, by the aid of the helm, have changed the position of the vessel so as to have avoided the contact.

4. That even if there had been a light suspended from the Thorn, as some of her crew swore, yet, as they swore it was suspended behind the mainmast, it was not visible to vessels coming with, and actuated by the tide, (the only quarter from which danger was to apprehended,) as the vessel riding at anchor would present her bow to the current, and keep her light hid behind the masts to those vessels running with the current.

The plaintiffs, on the other hand, contended, and produced witnesses for the purpose of sustaining them, that the Thorn was not anchored in the channel, that she did hang out a lantern on her main peak halliards, (an appendage to and behind the mainmast;) and that there was an anchor watch duly placed.

They further attributed the collision to the negligence and misconduct of the defendants ; and contended

1. That it was improper to navigate the river at night.

2. That if the look-out on board the brig had, immediately upon the discovery of the Thorn, given a particular order to the helmsman, the collision would have been avoided.

The learned judge charged the jury in substance as follows :

" This action is in case, brought by the plaintiffs against the defendants, as the owners of the brig William Henry, to recover compensation for a loss sustained by the former, in the value of a quantity of Spanish hides belonging to them, on board the schooner Thorn, in the river Delaware, on her way from this to New York; alleged to have been occasioned by the negligence of those employed on board the brig William Henry, by the defendants, for the purpose of navigating and directing her. The injury complained of

(Simpson v. Hand.)

was done by the brig William Henry, on the night of the 26th of November, 1832; while coming up the river under sail, in running foul of the schooner Thorn, when at anchor near Thompson's Point, on the Jersey shore. By this collision, it seems, that the schooner was so much injured as to let the water of the river in, in such quantity as to immerse the hides completely, whereby they were greatly impaired in their value.

The right of the plaintiffs to recover in this action is grounded, as you must have perceived, upon the neglect of the captain and crew of the Henry to perform their duty; that is, to navigate her in such a manner as to avoid causing all needless and unnecessary injury to the Thorn, and the property on board of her. It is not for any wilful wrong or tortious act of the captain and crew on board the Henry that this action is brought or can be sustained. For if the act complained of, that is, the blow given by the Henry to the Thorn, were wilfully caused by those entrusted with the management of the Henry, the defendants, though owners of her, are not answerable for the damage or loss occasioned by it. They are only responsible for injuries arising from the negligence or unskilfulness of those employed to navigate and manage their vessel; and not for any wilful act done by them, amounting to a trespass; notwithstanding it may have occasioned an injury and damage to the plaintiffs.

It may, however, be proper to notice, in the first place, some things introduced into this cause, which, as it appears to me, are not intimately, if at all, connected with the merits of it. It has been shown that the plaintiffs effected an insurance on the hides in question with the Philadelphia Insurance Company; and thence it has been argued, by the defendants' counsel, that the plaintiffs are not without a remedy for the loss they have sustained, because the Philadelphia Insurance Company are liable to make it good to them, under the policy of insurance; it being a sea damage, and therefore expressly included within the terms of the policy. Admitting this to be so, I, however, do not conceive that it can or ought, with propriety, to have any influence upon your minds in forming your verdict; because, it is only on the ground of neglect, or a want of exercise of due caution and skill on the part of those employed by the defendants to navigate their vessel, having been clearly proved and shown to you, that the defendants in this action can be made liable to the plaintiffs. And if it be that such neglect or want of caution and skill, has been clearly shown as would render the defendants liable to make good the loss sustained by the plaintiffs, there is no reason why the liability of the Philadelphia Insurance Company, to make good the same loss under the policy which they subscribed, should be any defence for the defendants here, or exempt them from their liability in this action. It was not through or by their means, or at their cost, that the policy was effected, so as to secure and indemnify the plaintiffs against the loss that has accrued

Vol. vi.—40

to them.  It was effected and paid for by the plaintiffs themselves, without the least expense to the defendants; and the plaintiffs are at liberty to use it or not, as they please, until they shall have obtained satisfaction.  A plaintiff may have two or more remedies for the same injury, and pursue one or more of them at his election, until he shall have obtained redress.

It has also been said that the defendants ought not to be made answerable for the error merely of those employed by them to navigate the Henry; but only for fault or blame.  To this, however, I cannot give my assent.  The defendants are only called upon to answer here in a civil point of view, and not criminally; that is, to compensate the plaintiffs for the loss, if any, which they have sustained by means of the negligence or want of due caution or skill, on the part of the servants or those in the employment of the defendants.  It is certainly the duty of every ship-owner, when he engages hands to navigate and take the charge of his vessel, to ascertain beforehand that they are possessed of sufficient skill for such purpose, as well as vigilance in exercising due caution and care in the discharge of that undertaking; and if it should happen that injury and damage shall accrue to any third person, from deficiency in the former or delinquency in the latter, he will be liable to respond in damages to such amount as the jury, under all the circumstances, shall think just and equitable.

I come now to speak of the principles which I consider applicable to the navigation of the Delaware river; and which, it appears to me, ought to govern and regulate the conduct of all those engaged in it.

This river, being the only navigable communication between the city of Philadelphia, a place of vast commerce and business, and the ocean, must be considered as a great and leading highway, open to all nations in time of peace.  When looked upon as such, its channel may be thought to be sufficiently narrow for this purpose, and as having nothing to spare.  Hence it becomes of the very first importance, that the rules and regulations adopted, in regard to the navigation of it, shall be such as will best promote the end and design of its being used as a highway, by means whereof the commerce of the city of Philadelphia shall be increased and extended, if possible, to all parts of the world.  To effect this great object, it is very obvious that the more secure the navigation of it is made, for all those who venture their property on it, the greater the inducement will be to do so.  But this cannot reasonably be expected without an exercise of due skill, caution, and care, on the part of those concerned in directing the navigation of the river.

What, then, under this view, was the duty of the Thorn in coming to anchor?

First. To have selected a suitable situation, and, in doing so, to have got out of the channel, if practicable; for the channel of the river

not being very wide, anchorage in it would be the more likely to interfere with the passage of vessels, and to endanger the safety of persons and property, by means of collision.

Secondly. If she anchored in the channel, and the night was as dark as the witnesses say it was, a light ought to have been hung up in some conspicuous part of her, so that it might have been seen as far off, or as early as possible, by those sailing or passing in the river. This, it would seem, according to the testimony of most of the witnesses examined to this point, is done generally; but when the vessel has anchored in the channel, it ought never to be dispensed with.

Thirdly. In this latter case, a watch ought also to have been placed on the deck; so that vessels approaching might be discovered by him, and notice given, to do whatever might be necessary, in order to avoid collision, if found to be in the way of the vessel sailing: and,

In the fourth place, to have got out of the way of the William Henry for this purpose, as far as she could, by shearing to one side.

In order, however, to attain the grand object in view here, it is not sufficient that all these things should be attended to and observed merely by those on board the vessel at anchor; for you will readily perceive, that the observance of a duty by those having the sailing vessel in charge, in some degree corresponding to those laid down for those on board the vessel at anchor, will greatly promote and tend still more effectually to secure it. It is doubtless the duty of the vessel under sail, having no intention of coming to anchor, to keep the channel or course usually adopted and pursued by vessels under sail; also to have a light hung up when her sails are not set or spread; in such manner as to apprise or give notice to all concerned or interested in her approach; and provide, if necessary, for their safety, by avoiding collision. Again, to have a watch on deck to keep a sharp look out, that he may give notice of any apparent danger from collision with any other vessel, in order that those having the charge of each vessel, shall use their utmost endeavours or exertions to prevent it.

A proper application of these principles to the facts of this case, as you shall find, will, it is apprehended, bring you to a correct result. For instance; if you should find that the Thorn was lying at anchor altogether out of the channel and track in which vessels navigating the same are conducted, it would be immaterial whether she had a light and watch on deck or not; and being struck by the brig William Henry in such situation, the whole blame would attach to the latter, in having departed from her proper course; and the defendants, as owners, would be liable to make good the loss sustained by the plaintiffs. So, although you should find that the Thorn was in the channel, it not being safe or practicable for her to get out of it, yet, if she had a light, suitable for the purpose, hung up in some conspicuous part, so as to be visible in the way I have already de-

(Simpson *v.* Hand.)

scribed, and a watch on deck to keep a look out, and the hands on board did their duty, those on board and having charge of the William Henry, would seem to be chargeable with negligence, at least, in not having discovered the Thorn and avoiding her, and thus render the defendants liable as the owners of her. Again, if, without this being done in the Thorn, she was discovered by those having the charge and direction of the Henry, in time to have avoided the collision, but they neglected to use the proper exertion for doing so, until it was too late, the defendants would be liable in like manner. But if, on the other hand, you should find that the Thorn was anchored in the channel, without having placed a light and watch on deck, and was not discovered by those having the direction of the Henry, until it was too late to avoid the collision, the defendants would not be liable."

The jury found for the plaintiffs; upon which a motion was made for a new trial, and the following reasons were assigned.

" 1. The plaintiffs contended that the defendants had no right to sail the William Henry up the Delaware bay after dark, but were bound to anchor: they produced no evidence whatever of negligence or misconduct but this; on the contrary, it was fully proved that the William Henry had a skilful pilot, a competent crew, and that she kept a strict look out: under these circumstances, the finding of the jury must have been based upon the false principle that the vessel ought not to have been navigated by night.

2. Although the plaintiffs contended to the jury for the principle that the vessel should have lain at anchor during the night, yet the judge did not, in his charge to the jury, directly negative that proposition.

3. The William Henry was navigating the river, as was proved without contradiction, with a strict and vigilant look-out; such, however, was the obscurity of the night that the Thorn (the injured vessel) was not seen until she was only a few rods distant: some evidence was given that if the look-out had, at the instant of discovery, given a particular order to the helmsman, the collision or impact would have been avoided. The defendants contended that the want of presence of mind in the look-out, in a sudden and alarming exigency, and in consequence thereof not giving the most judicious order to the helmsman, or, if given, its not being heard, was not such negligence or fault as would make the owners of the brig William Henry liable for the consequences. The judge charged against this position of the defendants.

4. Because the judge declined to charge the jury that in case they believed that the collision was caused by the negligence or fault of

both parties, that then the damages should be apportioned between them; but on the contrary, negatived this proposition.

5. Because the verdict of the jury was against the law and evidence."

The case had been argued at December Term, 1838, by Mr. *F. W. Hubbell* and Mr. *J. S. Smith* for the defendants, and Mr. *H. Binney, Jr.*, and Mr. *J. R. Ingersoll* for the plaintiffs; and now came on for a re-argument.

Mr. *Hubbell* for the defendants.

It is a question whether the case is not a proper one for admiralty jurisdiction. The judge said, that although the Thorn was wholly negligent, yet, if there was also fault in the William Henry, the latter was liable; but this we say was a case of mutual loss, and proper for apportionment; the utmost the plaintiff could recover, if any, would be a proportioned amount. The error in the judge was in saying the plaintiff could recover his whole damage. In *Vander-plank* v. *Miller*, (1 *Mood. & Malkin*, 169; 22 *E. C. L. Rep.* 280,) in an action for running down a vessel, it was held that the plaintiff could not recover unless the injury was attributable entirely to the fault of the defendant. If the plaintiff were partly in fault, and by care might have avoided the accident, he cannot recover. That was a case, too, of an action by the owner of goods sunk. In the case of the *Woodrop Sims*, (2 *Dodson*, 85,) a case in the admiralty, the rules are also given. In the 2d vol. of the *Law Reporter*, 311, is another admiralty case—the case of *The De Koch;* where both were in default, and the court ordered a mutual contribution. *De Vaux* v. *Salvador*, (4 *Ad. & Ellis*, 420; 31 *E. C. L. Rep.* 106,) recognises this rule of the court of admiralty; viz., that the whole loss is to be added together, and equally divided among the owners. *Curtis's Adm. Dig.* 145, in a note to the case of the *Woodrop Sims*, borrows a note from the 17th vol. of the *Law Mag.* 330, respecting this rule, 1st, That no authority in the admiralty recognises it. In the case in *Dodson*, " apportion " does not mean equally divided. 2d. Supposing the greatest loss to have been produced by the one whose fault was greatest, the rule would be inequitable. 3d. No maritime writer states it except in case of inscrutable fault. The writer thinks it should be apportioned according to the degree of the damage and fault. In *Butterfield* v. *Forrester*, (11 *East*, 60,) it was held that one injured by obstruction placed in the highway, if riding immoderately, cannot recover. *Flower* v. *Adam*, (2 *Taunt.* 314.) In *Curtis's Adm. Dig.* 10, is a case showing that the admiralty of the United States has jurisdiction wherever there is the flux and reflux of the tide, and vessels engaged in maritime navigation. In *Venal* v. *Garner*, (1 *Cr. & Meason's Exch. Rep.* 21,) it was held, that neither party can recover where both are in the wrong, in case for running down a

ship. *Dunlap's Ad. Prac.* 85. 2 *Browne's Civ. & Ad.* 112. The admiralty has jurisdiction in cases of shippers of goods. 17 *Law Mag.* 327, when fault cannot be ascertained, or where the suffering party is alone in fault. The common law is, that where both are in fault, there is no recovery, as when it cannot be ascertained. If ascertained to be mutual, in admiralty it is apportioned. As regards a cargo damaged by collision, even a sailor comes in for a share, there is a right to a share in the valuation. 3 *Kent's Com.* 231. 3 *Haggard's Ad.* 431. If it is a *joint tort* by the owners of both, and the plaintiff has released one, that is a release of all. Part of the plaintiffs' claim is contribution for general average, (by losing anchor, &c. in consequence of collision,) in their last count. But their owners could not recover, this being voluntary. *Mayhew* v. *Boyce*, (1 *Stark. N. P. C.* 423 ; 2 *E. C. L. R.* 454.)

Mr. *H. Binney, Jr.* for the plaintiffs.

If the fault was mutual, there was no fault in us, the shippers: we had a right of action against the owners of both, and we selected the true cause. It is a tort and severable. The admiralty cases are cases of owners suing. The common law only requires the plaintiff to be free from fault. Here to implicate the plaintiffs you must show that the owners were the master's servants, or that a relation exists which implies this. In *Dodson*, 85, the action was by the owners, who had control over the management of the vessel ; whereas we had not. This is a common law case, though the admiralty has concurrent jurisdiction. *De Lovio* v. *Boit*, (2 *Gallison*, 398.) The English cases show that the common law has jurisdiction. The case in 2 *Law Rep.* 311, was an action by the owner. That in 31 *E. C. L.* 106, was a question between ships. And every case is so except one. That in 11 *East*, 60, was between parties. In 2 *Taunt.* 314, the principle stated by the chief justice is not law. *Venal* v. *Garner*, ( 1 *Cr. & Meas.* 21,) was a case of owners. The only case of shippers is *Vanderplank* v. *Miller*, (22 *E. C. L.* 280,) and it would seem they were also owners of the vessel. In *Laffer* v. *Pointer*, (12 *E. C. L.* 311,) it is said that the charterer of a vessel, *i. e.* he who charters to another, is not liable to one injured, not freighters of goods. *Abbott on Ship.* 83. In torts by several, plaintiffs may sue some or all. *Law* v. *Mumford*, (14 *Johns.* 426.) *Patton* v. *Gurny*, (17 *Mass.* 182.)

Mr. *J. R. Ingersoll* on the same side.

In *Mayhew* v. *Boyce*, the plaintiff himself was plainly in fault by not fastening the girth. A light was not necessary in this case ; there was light enough to see, and that is shown; and that they had six times the length they wanted. This point about general average is a mere trifle ; but it is not assigned in the reasons, nor was it suggested at the trial, where we might have struck it out.

(Simpson v. Hand.)

So as to the release, there was no objection at the trial. As to the admiralty, we never doubted we could go there; but the defendant ought not to complain, because it is better for him that we went into a court of common law: for the admiralty would only diminish our loss; whereas a court of common law would not allow us to recover at all, where there was any fault on our side. But no objection of that kind was made at the trial. *Karsby* v. *White*, (21 *Pick.* 254,) shows that the master of a vessel is not, at all times, to have a light in a harbor; it depends on circumstances.

The admiralty jurisdiction is exclusive only in questions of prize or no prize. *Doug.* 594. 3 *Binn.* 220. 1 *Bay*, 470. In matters in the Instance court of admiralty, the jurisdiction is not exclusive, but concurrent. 3 *Dall.* 19. 10 *Wheat.* 473. 10 *Pet.* 108. Jurisdiction over torts. 3 *Mass.* 242. *Bee,* 51. 2 *Gall.* 308. 4 *Mason,* 380; seduction of a boy, and carrying him to sea. The man who puts on board the cargo may be in fault, as by putting igniting substances on board, or rotten hides, &c.; but we were innocent, and have nothing to do with the Thorn. The admiralty doctrine is impracticable, inasmuch as it would confound the innocent shippers with the two defaulters. The injured person may, at common law, select the man who injured him, as in the common cases of joint tort feasors. There is no pretence of mutuality as respects us. In *Sergeant's Con. Law*, 270, (202) citing 4 *Dall.* 426, it is laid down, that the admiralty courts here have jurisdiction in maritime torts committed on the high seas, or in ports and harbours, where there is a flow and reflow of the tide; but it is concurrent with the common law. The judiciary act of the United States saves the remedy at common law in vesting admiralty jurisdiction. 2 *Chit. Gen. Pr.* 515. *Slocum* v. *Mayberry*, (2 *Wheat.* 1.) 10 *Wheat.* 108. 1 *Taunt.* 568. 1 *Holt's N. P.* 359. *Bussey* v. *Donalson*, (4 *Dall.* 206.) 1 *Wash. C. C.* 142. *Snell* v. *Rich*, (1 *Johns.* 305.) The right of jurisdiction attaches where the suit is first brought, as respects the plaintiff. In 6 *Pet.* 143, we find reasons why parties may go into admiralty or common law. 2 *Gall.* 477. 1 *Paine*, 180. 2 *P. A. Browne's Rep.* 355, 335.

In the 2d place, I say, we have nothing to do with the conduct or fault of the two ships. We are third persons, disconnected, innocent sufferers. In *Warren* v. *Ins. Co.* (14 *Pet.* 111,) the case of *De Vaux* v. *Salvador* is overruled; and it is decided that underwriters are liable for average losses occasioned by a collision. The Insurance Co. here are in reality the plaintiffs. The defendants were the proximate cause, which is enough. It is no answer that another does a foolish thing; as if a drunken man being on a rail-road, the conductor runs over him wilfully. Here, all that the judge says, is that if the defendants had time to avoid the collision, but they did not use proper exertion, the defendants are liable. *Jacobs on Sea L.* 337. The damage the cargo sustains by collision is particular

(Simpson *v.* Hand.)

average.  That is, it takes care of itself, and is not brought into contribution.  *Jacobson*, 337, a ship under full sail is liable.  In the *Code de Commerce*, tit. 11, § 437, the law is thus stated.  If the collision is fortuitous, it is borne by the sufferer.  If by fault of one, by him who caused it: if there are doubts, it is equally shared.  Not a word is said about the cargo.

3. The verdict is right, though the learned judge might be wrong in a principle of law; and no new trial will be granted.  *Wakely* v. *Hart*, (6 *Binn.* 320.)  If, on the merits, the verdict is as it ought to have been, the court will not disturb it.  It is an appeal to the discretion of the court, and the question is whether injustice has been done.  But I maintain that what the learned judge said was right; and that if the Thorn was in default, yet, if the William Henry did not use proper exertion to avoid her, when she could turn out of the way, the defendants are responsible.  She had only to try to avoid it; and the evidence shows there was ample time to do it; and she chose not to do it, and the collision took place in consequence of this neglect.  It was the efficient cause.  All that could be added to the Thorn would not put the William Henry in a better state to avoid the blow.  And this was what Judge KENNEDY left to the jury, and they have decided it.

*Reply.*

I don't deny that the common law courts have jurisdiction; but I assert that the gravamen in this case is proper only for a court of admiralty.  We say that in a common law court, if there is fault on the part of the plaintiff, he can't recover.  It is enough for us if we had shown that there was some evidence that the plaintiff was in fault.  Does the circumstance of the plaintiffs being owners, and innocent, differ the case?  Can they say you are all guilty, both the Thorn and William Henry, and we can sue you as trespassers, jointly or severally?  But the ship owners are owners of this cargo *pro hac vice*; and the plaintiff can't implicate it in wrong, and yet have a right of recovery.  If a bailee sues, and recovers, the bailor can't, and *vice versa*.  If the carrier would be barred, can the shipper recover on the same title, and for the same injury?  No such case can be produced.  The possession by the bailee involves the bailor in all the consequences of the default of the bailee.  6 *Bac. Ab.* 564.  If the bailee has delivered goods to a stranger, the bailor can't sue for them.  The case of *Vanderplank*, already produced, shows the principle we contend for applied by Lord TENTERDEN.  *Smith* v. *Smith*, (2 *Pick.* 621,) involves the same principle.  There the owner of the horse was innocent.  *Bac. Ab.* tit. Trover, C. (last ed.) 804.  If either bailee or bailor recover in trover, the other is ousted out of his action.  The *vis inertiæ* of the Thorn was much increased by the cargo; without it she might have veered by the blow.  They are not jointly liable; there was no concert or community of design

or act. If they were, (as is now first suggested) then their release bars them. As to general average, there are two express counts for cable lost, and other damage, for which the plaintiffs had to contribute $200. If they did not participate, (as they say) yet they claim under the owners of the Thorn. But if the owners of the Thorn got in by negligence of theirs, of any sort, they could not recover of the shippers. They could not recover of the William Henry. Yet this was included in the verdict. The verdict was against the evidence. All agree that the Thorn was in 30 feet water; therefore in the channel. There was no night watch at the time to sheer off. Doubtful if the light was visible; the place was improper. In the William Henry all were on the look-out. The 800 feet, at 9 miles an hour, took one minute. The passenger proves an order by the mate to his steersman, and again to the other vessel. But it did not reach the pilot's ear. The pilot swears he did not see the vessel, owing to there being no light; and there was not time to repeat the order.

The opinion of the court was delivered by

Gibson, C. J.—It is an undoubted rule, that, for a loss from mutual negligence, neither party can recover in a court of common law; and, so general is it, that it was applied in *Hill* v. *Warren*, (3 *Starkie R.* 377; S. C. *E. C. L. R.* 390,) to the negligence of agents, respectively appointed by the parties to superintend the taking down of a party wall. Courts of admiralty, indeed, decree according to the circumstances, so as to apportion the loss; but certain it is that a court of law, whether for its inability to adapt its judgment to the merits of such a case, or whether for any other cause, refuses to interfere at all. It has been pressed upon us, however, that though such be the rule betwixt owners of coasting vessels or wagons, it is because seamen and wagoners are the servants of their employers, and have consequently power to affect them by their acts; that a carrier is not the servant of his employer, but an independent contractor; and that there is no more privity betwixt the owner of the vehicle and the owner of the goods, than there is betwixt the owner of a stage-coach and a passenger in it, who may, it is said, have an action against the owner of another coach driven carelessly against it to his hurt, without regard to the question of negligence betwixt the drivers. The argument is plausible, but the authorities are against it. *Vanderplank* v. *Miller* was the very case of an action by the owners of goods damaged by collision; and Lord Tenterden, without adverting to the supposed distinction betwixt them and the carrier, directed that, if there was want of care on both sides, the plaintiffs could not recover. The force of the decision is attempted to be evaded by supposing the owners of the goods to have been their own carriers: but nothing in the report gives colour to such a supposition; and owners of both goods and vessel would scarce have

brought their action for damage to the goods alone. That case, therefore, is in point; and though it was ruled at Nisi Prius, the counsel seem to have been satisfied with the verdict. To the same purpose is *Smith* v. *Smith;* the difference being that the person who had the horse in charge at the time of the injury, was not a carrier, but a bailee for hire. Still he was no more than a carrier, the owner's servant; nor was he less liable, on the contract, for actual negligence. But the principle is founded in reason as well as authority. There is at least privity of contract betwixt a merchant and his carrier; and the former, when he commits the management and direction of his goods to the latter, giving him, as he does, authority to labour and travail about the transportation of them, necessarily constitutes him, to some extent, his agent; and this inference is sanctioned by judicial decision. In *Bedle* v. *Morris,* (*Cro. Jac.* 224,) an owner of goods stolen from a carrier at an inn, was allowed to maintain an action for them against the innkeeper; and as the latter is liable only for things *infra hospitium,* and to passengers and wayfaring men, as was ruled in *Calye's case,* (8 *Rep.* 63,) it follows that the action was maintained not on the right of property, but on the relation of innkeeper and guest; and that the owner, to bring himself within it, was allowed to treat the carrier as his substitute. It will not be pretended that, had the innkeeper's vigilance been put asleep by misrepresentation of the carrier in respect to the value of the goods, it might not have been set up in bar of the action; yet that would have made the owner liable to the consequences of the carrier's deceit. Neither will it be pretended that an owner could recover for special damage, occasioned by gross negligence of the carrier in suffering the goods to be tumbled into a trench cut across the highway; for that would make the author of a public nuisance answer for a private wrong which he did not commit; yet if the owner were not to be affected by the carrier's negligence, such an action might be maintained on the right of property. So far has the owner's responsibility been carried in every species of bailment, that, where beasts in the custody of another who does not appear to have been his servant, were suffered to commit a trespass, the owner of them was held to answer for it. *Viner,* Trespass, B. pl. 1. The case put of injury to a passenger from a collision of a stage-coaches, wants the essential ingredient of bailment to complete its analogy to the present; but I am not prepared to admit that even he could have an action for mutual negligence against any one but him to whose care he had committed his person. A carrier is liable to his employer at all events; and to make his associate in misconduct answerable for all the consequences of it, would make one wrong-doer respond, in ease of another, for an injury that both had committed. It is more just that the carrier should answer to his employer, rather than one in whom the employer had reposed no confidence. What remains, then, is to inquire whether there was evidence, in the case

before us, of mutual negligence in the conduct of those who had the vessels in charge.

That there was carelessness on board the William Henry was proved by her own crew. The pilot testified explicitly that the accident would not have happened if the mate, who was on the look out, had done what was palpably his duty. The Thorn was perceived when she was at the distance of nearly three hundred yards; yet, though he called out to starboard the helm, the order was neither responded to nor repeated. He said further, that the mate gave him no intimation of the Thorn's presence till she was struck; and that had he done so while she was distant twice the length of his own vessel, he could have cleared her. The mate himself says that he gave no intimation to the pilot at all; and that his call was to the man who was supposed to have the Thorn in charge. It was, then, gross negligence in him to recur to a measure so uncertain, in exclusion of that which was the most natural, easy, and proper. To avoid every chance of accident from the probable drowsiness of the anchor-watch, he ought to have given the order to the steersman of his own vessel, known to be on the alert. Even had it been certain that the anchor watch was equally so, he was bound to know that a vessel at anchor could not be so readily got out of the way, as it could be cleared by another in motion; and it was his duty to take his measures accordingly. Such was the evidence of negligence on board the William Henry; and what was the evidence of it on board the Thorn?

There were three points of fact to which the attention of the jury was at first directed, but from which it was unfortunately withdrawn in the sequel. The Thorn's position in relation to the channel; the burning of a signal light aboard of her; and the conduct of her anchor-watch. As regards two of them, her position and light, there was a conflict of evidence. Four of the six persons who composed her crew, testified that she was anchored out of the thoroughfare or customary track; that the mate set an anchor watch; and that he placed a signal lantern in the peak-halliards. This was before the crew retired to their berths; but the point of time material to the question was the instant of the collision, and what was the state of things then? The plaintiffs' witnesses asserted that the light was burning in its place when they came upon deck, a few moments after the shock; while those on the adverse part, including one of the Thorn's crew, testified that no such thing was visible, and that they would have seen it had it been there. Again, the defendants' witnesses testify that the Thorn was lying in the very middle of the channel; a fact rendered probable by the depth of her water; and if she was lying there, without a light to mark her position and presence, she had not used those precautions which prudence required. It was, indeed, ruled in *Carsly* v. *White*, (21 *Pick.* 254,) that there is no rule of positive prescription like the ordinances of Oleron, or

any general usage, which requires a light to be constantly exhibited in the night time by a vessel at anchor in a harbour; and that whether the omission of it be negligence to bar an action for a collision, must depend upon the impression made by the circumstances on the minds of the jury. A vessel is doubtless not bound to show a light when she is moored out of harm's way; but vessels run at all hours on the Delaware; and it was proved to be a custom of the river to set a light in· nights of unusual darkness; and though there is no positive law to enforce it, the neglect of it must give a false confidence to an approaching vessel which she would not feel if there was no custom at all. In such circumstances, a want of conformity to the custom is an allurement to disaster. Indeed, the hoisting of a light is a precaution so imperiously demanded by prudence, that I know not how the omission of it could be qualified by circumstances, any more than could the leaving of a crate of china in the track of a rail-road car; or how it could be considered otherwise than as negligence *per se.*

Betwixt the stories of those who spoke of the conduct of the anchor-watch, there can scarce be said to have been a difference.· The pilot testified that he ran forward at the time of the collision, and that no person was then on the Thorn's deck. Evans, the passenger, said the same; and he, as well as the mate, declared that the first man they saw on board of her, was in the act of coming out of the cabin. M'Cracken, who was one of the Thorn's crew, deposed that neither light nor watch had been set; that the crew, at the time of the disaster, were asleep in their berths; that he and Joe, the reputed anchor-watch, slept together in the forecastle; and that, being roused by the jar, they got on deck through the scuttle, where they found that no one had preceded them. In addition, no one pretended that an answer was returned when the Thorn was hailed. On the other side, the master of the Thorn testified that when he came up, he found Joe on deck; the mate said the first man he saw on deck was Joe; and Hess, the seaman, said that he found Joe on deck forward. Now this may have been perfectly true, and yet Joe may have been asleep when his services were wanted; nor is it at all inconsistent with the testimony on the other side. The only witness who pretended to say where he was at the time of the collision, said that he was not at his station; and Joe himself was not called to contradict him. Now, though the rule is that a vessel in motion is bound to shape its course so as to pass another at rest, if need be, without its co-operation, it seems to be the custom of the Delaware for the crew of a vessel, at anchor in the stream, to give such a shear as may prevent a vessel in the act of passing, from running foul of it in case of accident. Had that been done in this instance, the disaster would have been escaped; and though the want of co-operation did not justify the mate's negligence in not taking his measures so·as not to need it,

(Simpson *v.* Hand.)

it would fix an imputation of negligence on the Thorn to show that her anchor-watch was not at his station in time to afford it.

Instead, then, of being told that, notwithstanding the Thorn may have been deficient in any, or all, of the preceding particulars, the plaintiffs would be entitled to recover if she was perceived on board of the William Henry in time to be avoided, the jury ought to have been told that if she was moored in the channel, without a light burning at the time; or that if her watch was not present, and did what is customary on such occasions, her people were obnoxious to such a charge of negligence as would bar the action; and that the burthen of proof lay on the plaintiffs.

New trial granted.

END OF DECEMBER TERM, 1840.

# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT, MARCH TERM, 1841.

[PHILADELPHIA, MARCH 22, 1841.]