## Case No. 7,984.

### The LADY FRANKLIN.

[2 Lowell, 220.] [1]

District Court, D. Massachusetts. March, 1873.

COLLISION—ANCHORAGE—DUTY OF WATCH.

1. A vessel in motion and under command is presumed to be in fault if a collision occurs between her and a vessel at anchor in a harbor in the daytime.
[Cited in The Delaware, 12 Fed. 573.]

2. The laws of Massachusetts give to the harbor-master of Boston the power to designate places of anchorage for vessels in the harbor of

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

Boston; and a place so designated is a proper place, though in the channel.

3. Those laws require all vessels to keep an anchor watch at all times.
[Cited in The Ancon, Case No. 348.]

4. An anchor watch is not bound to take any active measures to get his vessel out of the way of a vessel under command approaching in broad daylight at the rate of eight knots.
[Cited in The E. A. Packer, Case No. 4,241; The Rockaway, 19 Fed. 453; Wells v. Armstrong, 29 Fed. 219.]

5. Such a watch is not bound to hail the approaching vessel, unless he discovers that his vessel is not seen. He has a right to suppose she will be seen.
[Cited in The James M. Thompson, 12 Fed. 195.]

The libellant's case was, that his schooner, the Ida J., was anchored in the harbor of Boston, in a lawful and proper place, at about noon of the 22d July, 1872; and that the Lady Franklin, a schooner of about ninety tons register, was running out light, making about eight knots, with a free wind and favorable tide, and ran so near the Ida J. that the jib-boom of the latter was caught in the leach of the Lady Franklin's foresail, and the vessels were entangled for a time, and some injury was done to the complainant. The defence was, that the Ida J. was lying in an improper place, without an efficient anchor watch, and that the collision might have been avoided if the libellant's schooner had been either sheered or dropped astern, or even if a hail had been given. Two witnesses deposed that the Ida J. was anchored in a position designated by the harbor-master, and had been lying there three or four days, waiting an opportunity to discharge her cargo of timber; that the tide was half ebb, and the depth of water at the place of collision about fourteen fathoms. The expert witnesses for the defence were of opinion, that, if there was as much water as was testified to, the Ida J. must have been anchored in the channel; and the master and mate of the defendant vessel arrived at the same conclusion from observation. The experts testified that an anchor watch was bound to keep a constant and vigilant lookout, and to take all necessary measures for avoiding collisions, and that the measures mentioned in the answer would have been successful in this instance.

F. Dodge, for libellant.
L. W. Howes, for claimants.

LOWELL, District Judge. That a vessel which is in motion is bound to avoid one lying at anchor, is a rule so plainly founded in reason, that there can never have been different opinions about it. It may be well enough, notwithstanding, to note a few of the many cases in which it has been distinctly affirmed under various circumstances. The Girolamo, 3 Hagg. Adm. 169; The Louisiana, 3 Wall. [70 U. S.] 164; The Granite State, Id. 310; Amoskeag Manuf'g Co. v.

The John Adams [Case No. 338]: The D. S. Gregory [Id. 4,102]; The Scioto [Id. 12,508]; The Julia M. Hallock [Id. 7,579]; The Wanata [Id. 17,138]. In The Granite State, above cited, Mr. Justice Grier says, that the fact of collision with a stationary vessel is conclusive evidence of fault on the part of the moving vessel. This means, I suppose, that testimony of actual vigilance will not suffice to rebut the presumption of the want of it under any ordinary circumstances. In this case there is nothing to excuse the respondent vessel. This is one of those rare instances in which the evidence is wholly free from obscurity or contradiction. The day was clear and fine, the wind moderate, the Lady Franklin was coming down with a free wind in a direction parallel to that in which the libellant's vessel was heading, and there was no difficulty in seeing and avoiding her. No reason has been given or suggested why this was not done, excepting that the crew were busy in stowing the anchor and preparing the vessel for sea, and that they happened to be on the windward side of the vessel, where the sails interfered with their view. This, of course, is no excuse for not keeping a vigilant lookout, while navigating a harbor likely to be full of vessels in motion or at anchor.

It is ably argued, with the support of accomplished experts, that the libellant's schooner was anchored in the channel, out of place, and that the anchor watch, if the men on deck can be called so, kept no sufficient lookout, being busy, like those of the sailing vessel, in work about the deck, and failed to do their part in the navigation; and so that the loss of both vessels should be divided. There is evidence tending to show that the Ida J. was anchored in the channel, though, perhaps, near the edge of it; that she had been there for some days, and had taken the position pointed out by the harbor-master. It is a mistake, I apprehend, to maintain that the law prohibits anchoring in the channel. The statute of 1847, c. 234, § 1 (8 Sp. Laws Mass. 800), forbids vessels to come to anchor within five hundred feet of certain lines; but there is no evidence that this vessel was within that prohibition. Sections 5 and 6 provide for appointing a harbor-master, and authorize him so to regulate the anchorage of vessels, that, as far as may be practicable, ferry-boats may pass unobstructed, and the channel may be kept clear from the wharves to Castle island. This is not a positive requirement that the channel shall be kept clear, but that the harbor-master shall arrange matters to have it kept so, as far as may be practicable. It was not practicable, I suppose, for this schooner to anchor on the flats, because her deck-load would be likely to strain her when she took ground; but, at any rate, the harbor-master is, by the law, made the final and only judge of this; and the fact that this vessel was placed by him

is not directly contradicted, as it might have been, if false, and the only implied contradiction is found by assuming that he would not have placed her in the channel, which I do not feel at all justified in taking for granted. This part of the case is much stronger for the libellant than was that of The John Fraser, 21 How. [62 U. S.] 188, in which the learned chief justice, delivering the opinion of the court, which, on this point, appears to have been that of all the judges, said that the harbor-master appeared to have acquiesced in the ship's being where she was, though it seemed contrary to the ordinance of the city of Charleston, and that the court ought to take his practical construction of the local rule as sufficiently exacting. In this case there was something more than acquiescence on the part of the officer of the port, and a less positive command on the part of the law, requiring no latitude or laxity of construction to warrant his conduct or acquiescence as being within the scope of his duty as defined by law.

The statute of 1848, c. 314 (8 Sp. Laws Mass. 1007), enlarges the powers of the harbor-master, and by section 4 provides that all vessels at anchor in the harbor of Boston shall keep an anchor watch at all times. The evidence was not particularly directed to the inquiry whether the master of the Ida J. had notice or knowledge of this law; but no denial was made of such knowledge, and it appears to be very generally known, and was assumed to be so in the whole conduct of the case. Granting that this fact was so, and that the law is binding on the libellant, the questions are, what are the duties of an anchor watch? and, was there such a failure to fulfil them as renders the Ida J. jointly responsible for the collision? The statute takes for granted that the duties of an anchor watch need no explanation. I have looked into the books without finding any definition. Mr. Dana, in his Dictionary of Sea Terms (page 129), describes "anchor watch" as a small watch of one or two men kept while in port. Captain Totten, in the Naval Text-Book and Dictionary (page 443), defines it as a watch of three or four men kept constantly on deck, and stationed at one of the anchors, while riding at single anchor, to see that the stoppers, painters, cables, and buoy ropes are ready for immediate use. The experts examined in the case of The Rival [Case No. 11,867], and those who testified for the defence in the case at bar, agreed that one man is a sufficient anchor watch. The experts in this case added that he was bound to keep a thorough and constant lookout, and to be ready to take measures to avoid a collision; and that he should have discovered the Lady Franklin, and have either sheered his vessel's head towards the flats, or have let out her chain, and should, besides, have hailed the approaching schooner; and that in their opinion either of the two first-men-

tioned measures would have been effectual. Notwithstanding this testimony, I am hardly ready to decide that an anchor watch is bound to the same vigilance, at all events in the daytime, as the lookout of a vessel under way. The name would seem to imply, in accordance with the definition of Captain Totten, that the original purpose of this watch was to guard against the ship's dragging or drifting, by looking carefully to the anchors and cables. And the fact, fully admitted at the trial, that one man is all that the law or usage requires, confirms this; for one man cannot be expected to do efficiently all the various things which the experts seemed to expect of this watch, and there is no obligation on the remainder of the crew to be on board in fair weather. I do not mean, of course, to say that the anchor watch is not to do whatever may be needful and possible to prevent a collision. My doubt is whether he is bound to be constantly and vigilantly on the lookout against the negligence of approaching vessels, which are under full command, and are bound to see and avoid him, and have ample and undoubted opportunity to do their whole duty. If so, the next thing will be to require a man to be stationed at every wharf that adjoins the channel, to warn vessels not to run against it.

But if it be admitted that the crew of the Ida J. ought to have seen the Lady Franklin, I cannot agree that they were bound, or would be authorized, to change the position of their own vessel. It is a point that comes up in nearly all cases of collision, whether the vessel which is bound to keep her course ought not to have seized an obvious occasion to change it. I have nothing to add to what I have often said upon that subject. While I admit that a vessel is not to be obstinately kept in position when it is nearly certain that, by a change, she may enable the other vessel to escape the consequences of a mistake or neglect, yet it is only in extreme cases that a change can be permitted, without throwing all the rules into confusion. A vessel at anchor is bound to keep her place. If the Ida J. had been sheered to the right, it might have caused a disaster; because the Lady Franklin had the option to pass on that side, if she chose, and there was at that time water enough on either side. The experts think that there was a moment when they could have seen, had they been on the deck of the libellant's vessel, which way it would have been safe to sheer her. The law does not require an anchor watch to have the skill and experience of these gentlemen. It would not trust him to sheer his vessel. Similar observations apply to the other proposed action, by dropping down with the tide; for this would have had the same effect, or nearly so, as sheering.

Nothing remains but the question whether the crew of the complaining vessel are to be held to have contributed to this misfortune, by their failure to see and hail the other vessel. This I have virtually decided, in holding that they were not bound to the same vigilance in observing approaching vessels that the latter should exercise towards them. The parties are by no means in pari conditione. As the vessels were lying in parallel lines, and the Lady Franklin was coming down with a free wind, and going over the ground at about eight knots, it would hardly occur to a lookout to anticipate danger until the last moment; because a very slight change of the Lady Franklin's helm would carry her clear. If such a lookout had seen the schooner coming, I do not know that he could be held bound to notify her to keep out of the way. I do not remember that a vessel entitled to hold her course has ever been held liable, merely because she did not hail.

I have examined with care the decisions on this subject. In most of those in which the anchored vessel has been blamed, it was for want of a light at night. In two cases, in which the want of an anchor watch has been found to be a fault, the approaching vessel was not under command, but was drifting towards the other slowly, and could have been easily avoided by one of the several simple precautions, for which there was ample time. Buzzard v. The Petrel [Case No. 2,261]; O'Neil v. Sears [Id. 10,530]. The case most favorable to the respondents is Simpson v. Hand, 6 Whart. 311; but in the opinion delivered in that case the chief justice, at page 324, puts the decision upon a usage of navigation in the Delaware. "It seems," he says, "to be the custom of the Delaware for the crew of a vessel, at anchor in the stream, to give such a sheer as may prevent a vessel in the act of passing from running foul of it in case of accident." What may be the limitations or conditions of that usage, and whether it depends on local circumstances, I do not know; but no usage is proved here to sheer vessels at anchor, and in my judgment it could not be done with propriety in such a case as this, without a usage to warrant it, or a hail to ask for it. While a person of great skill and coolness might have succeeded in moving the Ida J. in time, I cannot think that any obligation rested on her people to be prepared for such an extraordinary emergency, unless warned of it by the moving vessel. The parties cannot be held to be, I will not say equally blameworthy, for that is not the question, but to be at all on a similar footing: the duty rested on the party that could most easily perform it, and his failure brought about the disaster, without any legal culpability on the other part. Decree for the libellant.

---

The LADY FRANKLIN. See Case No. 1,969.
The LADY FRANKLIN. See Case No. 9,322.