WELLS v. ARMSRTONG.[1]

(*District Court, S. D. New York.*   November 24, 1886.)

1. COLLISION—NECESSITY FOR ALLOWING SUFFICIENT MARGIN FOR SAFETY.
    A vessel must allow a sufficient margin for the contingencies of navigation, in undertaking to avoid another vessel, and must take decisive measures in time.
2. SAME—VESSEL AT ANCHOR—EXCEPTIONAL CIRCUMSTANCES—NECESSITY FOR CARE BY ANCHORED VESSEL.
    While a vessel at anchor in a proper place, in the day-time, and in fair weather, is not ordinarily required to be on the watch to avoid vessels under way, having control of their motions, yet, under exceptional circumstances, when the vessel under way is subject to special difficulties in her navigation, some care on the part of the vessel at anchor may become obviously prudent and necessary, that would not otherwise be obligatory.

[1] Reported by Edward G. Benedict Esq., of the New York bar.

**3. SAME—STATEMENT OF CASE—APPORTIONMENT.**

The schooner C., while lying, during the day-time, in the middle of the outer entrance to Hampton roads, and heaving upon her anchor preparatory to going to sea, was run into by the schooner K., which, with a large fleet of vessels, had come down from above on her way to sea, and which, owing to the intervening vessels, did not observe the C. until within 200 or 250 yards of her. The evidence indicated that the collision might have been avoided had the C. starboarded her helm, or paid out chain, as she was hailed by the K. to do. No one was at the wheel of the C. and she did nothing to avoid collision. *Held*, that both vessels were in fault, the K. for not avoiding the C., which, on the evidence, she might have done by prompt and effective measures; and the C. for an entire lack of prudence, attention, and assistance in avoiding danger, while voluntarily suffering herself to remain as an obstruction in the midst of a large fleet of moving vessels.

**4. SAME—DAMAGES—PUTTING BACK FOR REPAIRS.**

A schooner having had her jib-boom carried away, and fore-chain plate broken, in a collision, is justified in putting back to repair them, before proceeding to sea.

In Admiralty.

*Wilcox, Adams & Macklin*, for libelant.

*Thomas J. Ritch, Jr.*, for respondent.

BROWN, J.  At about 7 A. M., on the morning of March 4, 1885, as the three-masted steamer Cochico, then lying at anchor near the outer part of the entrance to Hampton roads, was heaving upon her anchor preparatory to getting under way, in a strong ebb-tide, she was run into by respondent's three-masted schooner Kelsey, which carried away the Cochico's bowsprit, and did some other damage, for which this suit is brought.

A large fleet of 150 vessels or upwards had previously put in at Hampton roads on account of the weather, and anchored from one to seven miles above the Cochico.  On the morning of the 24th, the weather being fine, and the wind light from the W. or S. W., the whole fleet made sail together, and came down with the strong ebb-tide.  The Cochico was nearly in the middle of the channel, which was there about two miles in extreme width, half a mile at least on each side of her being easily available for navigation.  The fleet was so numerous that the Cochico was not perceived by those on board the Kelsey until, as the master of the latter states, he was from 600 to 750 feet only distant from her.  At that time, as the lookout says, another intervening vessel, nearly directly ahead of the Kelsey, went to the northward, i. e., on the starboard side, of the Cochico, disclosing the latter to his view.  She then bore about a point on the Kelsey's starboard bow.  The wind was four points abaft the Kelsey's beam, and, though light, gave her about one and one-half or two knots speed through the water.  The tide is estimated by the master at from one to one and one-half knots.

Although the more customary place of anchorage was further up the roads than the place where the Cochico anchored, her position was not altogether unusual; it certainly was not unlawful.  *The J.*

*W. Everman*, 2 Hughes, **17**. There was a sufficiently broad passage on either side to have enabled all vessels to clear her, as all save the Kelsey easily did. Although the Cochico could not be seen till she was quite near, still, upon the statements of the master of the Kelsey, I cannot doubt that there was abundant time for him to have cleared the Cochico by an ample margin for safety, had he promptly starboarded his helm at the time when he first saw the Cochico nearly ahead. Not only did the Cochico bear a point on his starboard bow, but the wind, though light, was so far aft as to favor a rapid change of his vessel under a starboard helm. He made but little change, however, in his course,—not over half a point, or a point; because, as he says, he had no apprehension of collision. He charges the collision to a sudden, sharp sheer of the Cochico to the northward, while heaving upon her anchor, and when about 100 feet distant, after a previous sheer to the southward. But the master saw that the Cochico was hauling in her anchor against the tide. He knew her liability to sheer either way in consequence. He was bound, therefore, to allow for such contingencies. The slight wind, and his slow speed through the water, while drifting straight towards the Cochico, made a strong change of wheel, instead of a slight change, most evidently necessary. His principal motion was, in fact, drifting in the line of the tide. The master probably miscalculated the amount of this drifting, through the presence of so many other vessels going with him, which would naturally tend to mislead him, through the drifting of all alike. His fault was that which I have had so frequent occasion to comment upon, namely, not allowing a sufficient margin for safety, amid the contingencies of navigation, and not taking in time the decisive measures at his easy command. *The Laura V. Rose*, 28 Fed. Rep. 104; *The Aurania*, 29 Fed. Rep. 98. As I must find that the master had sufficient time and space to keep out of the way, had he acted with the promptness and decision that reasonable prudence demanded, and as there was no other vessel that prevented his doing so, the Kelsey must be found in fault.

The Cochico is alleged to be also in fault, on the ground that, though hailed by the master of the Kelsey to starboard her helm, and pay out chain, she did neither; though either of these measures would have averted the collision. The hail to starboard was apparently given when the vessels were about 200 feet apart; the hail to pay out chain, when they were within about 100 feet of each other. The respondent's account of the blow, its angle, and the positions of the two vessels, is the most consistent, and I adopt it. The Kelsey was going towards the starboard side of the Cochico. Their starboard bows at first just grazed each other. The Cochico's anchor caught the after-shroud of the Kelsey's fore-rigging. Her jib-boom ran aslant, across the Kelsey's deck, from just forward of her main-shrouds, and got locked fast in her mainsail; the Kelsey's crew being unable to fend her off as she approached. I have no doubt that either a

sheer by the Cochico of a few feet to the southward, or dropping astern a few feet by paying out chain, would have avoided the collision. The Cochico's master had not been on deck during the Kelsey's approach. When he first looked out of the companion way, he says, the collision was inevitable, though he estimated the distance at 300 yards, and he returned to the cabin to look after his wife. The crew and the mate were forward, heaving up the chain, and there was no one at the Cochico's wheel, or on her quarter-deck. That the Cochico would have swung somewhat to the southward under a starboard helm, had it been starboarded when she was hailed to do so, cannot be doubted. Not only the experts so testify, but the mate says she would have sheered instantly under such a helm, had she been under a sheer to the northward; and the evidence shows that there was such a northward sheer. The small angle at which they struck satisfies me that a starboard helm, even when they were within 100 or 200 feet of each other, would have been sufficient to counteract the Cochico's northward sheer, and to change her position, and the direction of her jib-boom, enough to have avoided the injury. So, also, had the chain been let go upon which the Cochico's crew were hauling, as it might have been, within a few seconds after the hail to do so, as it seems to me, and, as the experts testify, the vessel would have immediately dropped astern with the tide, quite enough to have cleared the Kelsey. The evidence shows that both these precautions against accident in a tide-way, where other vessels are more or less drifting, instead of being unusual, is very common. In other cases before me they have been proved to have been employed.

Doubtless less vigilance is required of a vessel at anchor. Ordinarily, a vessel anchored in a proper place, in the day-time, and in fair weather, is not expected, or legally required, to be on the watch, and to stand prepared to take measures to avoid vessels under way, and having control of their motions. *The Lady Franklin*, 2 Low. 220; *The Rockaway*, 19 Fed. Rep. 449. But under exceptional circumstances, where the vessel under way is subject to special difficulties or embarrassments in her navigation, some care and precautions on the part of the vessel at anchor may become obviously prudent and necessary that would not otherwise be obligatory. Such, I think, is plainly this case. Here the circumstances were altogether exceptional. The wind was light, and the tide strong. The Cochico was anchored in a narrow part of the roadstead; and the immense fleet from above, coming down with the tide, and under imperfect control, or slow control, in the tideway, were necessarily more and more crowded together as they approached the narrower part of the roadstead, where the Cochico lay. Common prudence required of the Cochico some care amid such a fleet of vessels. The testimony of the experts, I think, on the whole, clearly sustains such a recognized obligation among seamen. Under such circumstances, I must hold that

reasonable attention and reasonable measures on the Cochico's part, to avoid accident, were incumbent upon her.

There was, in fact, no good reason for her long delay in getting under way. She was nearly an hour behind most of the fleet, some of which had already come down from several miles above. There was nothing to detain the Cochico there. Reasonable prudence, and a reasonable regard for her own safety, and for the safety of the other vessels, should have indicated to the captain that it was his business to be up and off with the rest of the fleet, instead of remaining, without reason, as an obstruction, amid such a crowd of vessels. *The Scioto*, 2 Ware, 360, 367, 368. If he chose to remain until the whole fleet were coming down thick on each side and in front of him, it was his duty, in my judgment, to be on deck; and, while the few other hands were at the windlass, to be himself at the wheel, in order to take at once those reasonable precautions which might aid in avoiding collisions that were likely to arise through the precise causes that operated here, viz., the obscuration of his own vessel from the view of another, through a third vessel intervening until they were very near each other; and specially to prevent any yawing of his own vessel. Had this reasonable care been taken, the collision would have been avoided, notwithstanding the tardiness in the maneuvers of the Kelsey. The Cochico must therefore be also held in fault, and a decree directed for half her damages only. *Simpson* v. *Hand*, 6 Whart. 311; *The Petrel*, 6 McLean, 491; *O'Neil* v. *Sears*, 2 Spr. 52.

I do not think the Cochico was bound to go to sea without a jib-boom, and with one of her fore-chain plates broken, though she might possibly have repaired the latter on the voyage. She was justified in putting into Norfolk for repairs, and is entitled to recover for her necessary detention. Whether she delayed unjustifiably there, will be one of the questions upon the reference to compute the damages.