### THE ADATO.

(District Court, S. D. New York.   December 15, 1903.)

1. COLLISION—MOVING AND ANCHORED VESSEL—CONTRIBUTORY FAULT.

   A collision occurred at the Delaware breakwater between the steamer Adato, in motion, and the barkentine Lovisa, at anchor. The steamer first started to pass on the starboard side of the Lovisa, but suddenly backed off, and undertook to pass on the other side, and when about abreast was caught by the tide and drifted against her. *Held*, that the steamer was clearly in fault for failing to make allowance for the tide, and that her claim of contributory fault on the part of the Lovisa in failing to pay out her anchor chain was not sustained by the evidence, which showed that until less than a minute before collision, and when the steamer was about 70 yards away, she was going straight, and there was no reason to anticipate danger until it was too late to avoid the collision.

In Admiralty.   Suit for collision.

Black & Kneeland, for libellant.
Convers & Kirlin and Charles R. Hickox, for claimant.

ADAMS, District Judge.   This action was brought by the libellant, as master of the Barkentine Lovisa, to recover the damages suffered from a collision with the steamship Adato, at the Delaware Breakwater, on the 9th day of April, 1903.

The Lovisa was bound from Cuba to Boston, with a load of sugar, and put into the breakwater for orders, on the day of the collision. She was about 180 feet long and drawing 19½ feet of water. She was anchored, about 4 o'clock P. M., in the space known as the Harbor of Refuge, between the two walls forming the breakwater, in about 6½ fathoms of water. . She let her port anchor go, with about 45 fathoms of chain. The weather was clear. The tide was flood and running in the neighborhood of 4 knots per hour. The wind was from the southwest and blowing at the rate of about 21 miles per hour. The heading of the Lovisa when anchored was about southeast. A barge was anchored off her port quarter, at a distance of about one-fifth of a mile.

The Adato, a steamship of about 345 feet in length, was drawing about 19½ feet forward and 21¾ feet aft. She was loaded with sugar and also went into the breakwater for an anchorage under the charge of a compulsory pilot. The steamship at first attempted to pass the Lovisa on the latter's starboard side but the pilot, having concluded that he would not find enough water in that direction, backed towards the breakwater and then attempted to pass on the port side, between the Lovisa and the barge. When the pilot determined that he had obtained a proper position in backing, he put his steamship's engine easy ahead, shortly half speed and finally full speed ahead.

As soon as the steamship gathered some headway, she was caught by the current on her quarter and set towards the Lovisa. The steamship's rigging caught the Lovisa's jib boom and the vessels swung together, side by side, at about 5:50 o'clock P. M., both being damaged by the collision.

There can be no doubt about the steamship's fault in colliding with an anchored vessel. The master was bound to know the set of the tide and its effect upon his steamship. The John H. May (D. C.) 52 Fed. 882; The D. H. Miller, 76 Fed. 877, 22 C. C. A. 597. The only real question in the case is with reference to a contributory fault on the part of the Lovisa. The steamship's claim is that when the contact became probable, the Lovisa failed to pay out the anchor chain, which would probably have averted the collision.

The Lovisa's second mate was on watch and in charge of the deck at the time. He was the only one there and has not been examined. Immediately after the collision, the vessel was towed to Boston and vigilant steps were taken by her proctors to get the testimony but through some neglect, apparently, on the vessel's part, the witness was not produced immediately and afterwards disappeared and could not be found. If the circumstances cast any burden upon the vessel, the fact of the absence of this testimony would bear against her.

The difficulty with the steamship's contention is, however, as appears from her own testimony, that she at first manœuvred to pass the Lovisa on the starboard side and suddenly abandoned that attempt and backed till she was about 600 feet away, then started to cross ahead and pass on the Lovisa's port side. There was nothing at first to indicate to the Lovisa that the steamship could not safely accomplish the intended movement. When the steamship got in apparently the proper position to pass, without danger, on the port side, her engines were put half speed ahead and she went straight for some time, until she was about 70 yards away from the Lovisa, when suddenly the tide caught the steamship and she was borne towards the Lovisa. Up to this time there was no apparent danger of collision, but those on the steamship then saw that collision was becoming imminent and to avoid it, her engines were put full speed ahead. A watch on the Lovisa, however, could not determine that anything was necessary to be done on her until the steamship was borne distinctly towards her. Then, the vessels were within less than a minute of collision and it was too late for effective measures by the Lovisa. There were no hails from the steamship to her at any time. The steamship apparently lost her forward movement towards the last and was set bodily towards the Lovisa, by the strong wind and tide, but this could not have been observed by the most vigilant watch on the Lovisa in time to have avoided the collision, or mitigated its consequences.

My attention has been called to a number of cases in which the anchored vessel was held partly in fault, viz.: Wells v. Armstrong (D. C.) 29 Fed. 216; The Henry Warner (D. C.) 29 Fed. 601; The Ogemaw (D. C.) 32 Fed. 919; The Anerly (D. C.) 58 Fed. 794; The Richmond, 63 Fed. 1020, 12 C. C. A. 1. In all these and simi-

lar cases, however, it is obvious that culpable neglect on the part of the anchored vessel to take some measures to avoid the collision was clearly shown and the authorities do not establish that in a case similar to the one under consideration, such a result should be reached. Each case must depend upon its own facts and I am satisfied that this anchored vessel should not be held responsible for any part of the damages. The Lady Franklin, 14 Fed. Cas. 934; The John H. May, supra; The W. J. McCaldin (D. C.) 35 Fed. 330; The Howard B. Peck (D. C.) 48 Fed. 334; The D. H. Miller, supra; Wilhelmsen v. Ludlow (D. C.) 79 Fed. 979; The Genesta (D. C.) 125 Fed. 423.

In The Howard B. Peck, it was said (page 336, 48 Fed.):

"A court is not called upon to divide the damages between an anchored vessel, which is acting in accordance with the rules, and is surprised by the approach of a vessel in motion, which is confessedly in fault, upon the surmise that, if the anchored vessel had shifted its helm, it might have escaped the collision."

And in The D. H. Miller, a case of collision between a moving vessel and an anchored vessel, it was said (page 879, 76 Fed., page 599, 22 C. C. A.):

"Where one vessel is clearly proven in fault, the other is not to be held guilty on mere presumptions or suggestions arising from the fact that a collision occurred. The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, 809 [39 L. Ed. 943], and the cases there cited."

Decree for the libellant, with an order of reference.