## Case No. 7,591.

### The J. W. EVERMAN.

PAULL et al. v. The J. W. EVERMAN. ARNOLD et al. v. SAME. ORIENT MUT. INS. CO. v. SAME. MERCHANTS' & PEOPLE'S LINE v. PAULL et al.

[2 Hughes, 17.] [1]

District Court, E. D. Virginia. Dec. 28, 1874. [2]

COLLISION—VESSEL AT ANCHOR—USUAL ANCHORING GROUND—TRACK OF STEAMERS.

Vessels of every class may anchor at will anywhere in Hampton Roads, within the area

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[2] [Affirmed by circuit court and by supreme court. See note at end of case.]

laid down and described in the charts of the United States coast survey, as "the usual anchoring ground," whether or not anchor be cast in the customary track of steamers; and vessels so anchored will not in case of collision be in fault merely by the fact of lying in such track.

[Cited in Mercer v. The Florida, Case No. 9,-433; Wells v. Armstrong, 29 Fed. 218.]

[These were libels by Joseph Paull and E. G. Pallot against the steamer J. W. Everman, by B. G. Arnold against the same, by the Orient Mutual Insurance Company against the same, and by the Merchants' & People's Line against Joseph Paull, E. G. Pallot, and others, for damages sustained in a collision.]

L. H. Chandler and W. H. C. Ellis, for the steamer Everman.
Wm. W. Old, for original libellants.

HUGHES, District Judge. The British bark Eliza and Maria, with a cargo of 3,860 bags of coffee, from the port of Santos, Brazil, put into Hampton Roads in the summer of 1872, anchored within half a mile of Fortress Monroe, where there was a telegraphic station, and was there awaiting telegraphic orders until the 13th September. On that morning the steamer J. W. Everman, from Philadelphia for Norfolk and Richmond, entered the roads from Chesapeake Bay, steaming about eight miles an hour, before a light breeze, and on a flood tide, and at about twenty-five minutes after 2 a. m. collided with the Eliza and Maria, lying at anchor, and sunk her, to the total loss of the cargo, worth $109,676 in gold, and of the bark, supposed to be worth $25,000. Libels were promptly filed in this court by the owners of the bark, the owners of the cargo, and the insurers of the cargo, against the steamer; and these were followed by a libel and petition on the part of the owners of the Everman (the Merchants' and People's Line) for the purpose of contesting and limiting their liability, under sections 3 and 4 of the act of congress of March 3, 1851 [9 Stat. 635], and the rules of practice in admiralty prescribed by the United States supreme court in pursuance of that act. That act limits the liability of the owners of a colliding vessel to the amount or value of their interest in the vessel and her freight.

The rules of law governing in such cases as that before us are as follows: First. A vessel in motion is bound, if possible, to steer clear of a vessel at anchor. Second. Vessels propelled by steam are required to take all possible care, by the use, if necessary, of all the means they possess, to keep clear of sailing vessels. Third. Where a steamer is about to enter a harbor, great caution is required; ordinary care under such circumstances will not excuse her for a wrong done. Some of the authorities for the foregoing rules are [McCready v. Wells] 18 How. [59 U. S.] 89; [The New York v. Rea] Id. 223; and [Culbertson v. The Southern Bell] Id. 584.

These authorities are imperative upon this court; but they concur with many English decisions, which is useless to cite here. In [McCready v. Wells] Id. 89, where a steamer moving in Long Island Sound "at the rate of sixteen or seventeen miles an hour in the direct track of the coasting trade, ran down a vessel which was lying at anchor," the weather being perfectly calm, the United States supreme court held "that the steamer was grossly at fault." In [The New York v. Rea] Id. 223, where a vessel lying at anchor in New York harbor was run down by a steamer (towing several heavily loaded barges) coming down the Hudson river with wind and tide in her favor, the United States supreme court decided that "it was a gross fault in the steamer to move in a harbor at night at a speed of eight to ten miles an hour." In [Culbertson v. The Southern Bell] Id. 584, where a flatboat was lying at Grand Gulf in the Mississippi river, at a place designated for flatboats to lie, was struck and sunk by a steamboat attempting to land, the court held the steamboat liable, declaring that more than ordinary care was required of a steamboat entering a harbor where vessels were lying at anchor. These authorities are strongly reinforced by the decisions of the supreme court in [The Johnson v. McCord] 9 Wall. [76 U. S.] 146; [The Corsica] Id. 630; [Liverpool Steamboat Co. v. Simmons] Id. 634; [The Suffolk County] Id. 651; [The Syracuse] Id. 672; [The Portsmouth] Id. 682; [The Favorita] 18 Wall. [85 U. S.] 598; and [The Falcon] 19 Wall. [86 U. S.] 75. Fourth. A vessel entering a harbor in the night-time is put on her utmost vigilance, and is responsible de levissima culpa; especially if the port be one much resorted to in bad weather as a harbor of refuge. In such case the master and crew ought to be on deck, and in such parts of the vessel as to be able to control her motions, and to see any vessel that lies in her track, and which may be approaching. The authorities on this subject, and as to sufficient lookouts, are very exacting. See [The Louisiana v. Fisher] 21 How. [62 U. S.] 1; [New York & B. Transp. Co. v. Philadelphia, etc., Co.] 22 How. [63 U. S.] 461; [Whitridge v. Dill] 23 How. [64 U. S.] 448; [Haney v. Baltimore Steam Packet Co.] Id. 287; [Sturgis v. Boyes] 24 How. [65 U. S.] 110; [The Hypodame] 6 Wall. [73 U. S.] 216; [Stark v. Starr] Id. 408; and [Pentz v. The Ariadne] 13 Wall. [80 U. S.] 475. Fifth. As a general rule, when a collision takes place between a vessel under sail and one not under sail, the prima facie presumption is, that the fault is in the vessel in motion; and this rule is enforced more rigidly against a steam vessel in motion than a sail vessel, because she is more manageable. The Julia M. Hallock [Case No. 7,579]; The Scottish Bride v. The Anthony Kelly [Id. 12,551]; The Scioto [Id. 12,508]; Jac. Sea Laws, 339; [Strout v. Foster] 1 How. [42 U. S.] 89; and [Wetmore v. The Granite State] 3 Wall. [70 U.

S.] 310. Sixth. The navigation laws of the United States require, by article vii, that ships, whether steamships or sailing ships, when at anchor at roadsteads or fairways shall, between sunset and sunrise, exhibit where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a globular lantern of eight inches in diameter, and so exhibited as to show a clear, uniform, and unbroken light, visible all around the horizon at a distance of at least one mile. Seventh. It is an old rule of maritime law that a vessel improperly moored, or in an improper place, can claim nothing for the damages she may suffer from collision with another. The Scioto [supra], citing numerous authorities. Eighth. By the maritime law, in case of collision between two vessels, the loss falls as follows: I. The vessel through whose fault it occurs bears its own loss and pays damages to the other for its loss. II. Where there has been no fault on either side, but the collision was the result of unavoidable cause, each vessel bears its own loss. III. Where there has been fault, but it is uncertain on which side it lies, the whole loss is divided equally between the two vessels. 1 Bell, Comm. 579; The Scioto [supra]; Lucas v. The Swan [Case No. 8,588]; The Nautilus [Id. 10,058]; Fland. Mar. Law, 296; Story, Bailm. 609, and notes. I am aware of the decision in [Lockwood v. The Grace Girdler] 7 Wall. [74 U. S.] 196, to the contrary; but that case is in conflict with the whole body of American authorities and most of the English and Scotch. IV. Where there has been fault on both sides, the loss is divided; but whether equally or unequally, will depend upon the equities of each case. If the case under trial falls in either I, III, or IV of these classes, the original libellants must recover to the amount of the value of the Everman; that value being far short of half the total amount of loss. It is only in the event that the Eliza and Maria was wholly in fault, and that the Everman was not at all in fault, that the latter can escape liability.

I proceed therefore to the main questions in this cause: Was the Everman not at all in fault? Was the Eliza and Maria wholly in fault? It is not denied that the Everman came into the roads on a dark night, before a light wind, on a flood tide; that Hampton Roads are much resorted to as a harbor of anchorage and of refuge by vessels of all nations, in all weather and at all times, and that there is no harbor-master for the roads, vessels being in the habit of anchoring there at will. Did the Everman enter the roads therefore at the speed and with the care, and using the precautions required under the circumstances? Rules first, second, third, and fourth, before given, decide that she did not. The proof is that she had nobody on the special lookout; that the captain and crew, except four persons, were asleep; that one of these four persons was engaged at the pilot-wheel; that two others were engaged in taking in sail aft on top of the ship's house; that only the pilot was on the lookout, who was in the pilot-house, which was twenty-five feet from the stem of the vessel; that the steamer entered the roads, and up to within a few moments of the collision was steaming at the rate of eight miles an hour; that the Eliza and Maria lay among a group of six vessels, all of which had their anchor lights brightly burning, and that no notice of her approach was given by the steamer by steam-whistle or otherwise. These facts are proved and undisputed, and I think under the rules first, second, third, and fourth, which have been stated, they place the steamer Everman in fault, if not in gross fault. She entered the roads (in which her own master proves there were two hundred vessels at anchor) at too rapid a speed. She had not a sufficient lookout on duty, indeed she had a grossly insufficient one; and she used no precautions, not even ordinary care, to avoid collision with vessels which might be lying at anchor in her track. Acker v. The Rainbow [Case No. 26]; 2 Eng. Law & Eq. 562; [The Genesee Chief v. Fitzhugh] 12 How. [53 U. S.] 462; Green v. The Adelaide [Case No. 5,752]; [Thorp v. Hammond] 12 Wall. [79 U. S.] 408; [The Ottawa v. Stewart] 3 Wall. [70 U. S.] 268, and cases before cited.

These facts alone would render the Everman liable to bear a part of the loss produced by the collision; and I might stop here, for she was appraised at only $12,-672.43, which in any event is far less than her contributive portion of the total loss. But as this case involves the right of free anchorage in Hampton Roads, it is proper that I should go on, and inquire whether the bark was in fault, and if so, in what respect. She is charged in the pleadings not to have had up a proper anchor light in her rigging just before the collision, and to have been moored at an improper anchorage.

It is useless to recapitulate the evidence relating to the light, except in a very brief manner. There were five sail vessels anchored near the Eliza and Maria on the same occasion, whose masters, or men on watch, concur in saying that her light was up immediately after the collision; two of them saying that it was up before the collision. Captain Face, the pilot of one of these vessels, the Bernard, which lay a quarter of a mile in advance of the bark, towards Fortress Monroe, says that when the Everman passed the Bernard, making for the Eliza and Maria, he looked towards the Eliza and Maria and her light was up. Nicholas Biesing, watchman on the German brig Allianze, which was anchored five or six ships' lengths from the Eliza and Maria, says that the Everman just cleared his jibboom and passed on towards the English bark. At the time of the collision the Eliza and Maria had a clear white light, shining bright, which could

be seen at a distance in her fore-rigging. Axel August Horgren, a seaman on the Swedish bark Amoy (one of the six vessels named as at anchor), who was on watch at the time of the collision, says, "The steamer Everman passed us within about thirty feet. We had a bright anchor light. The Eliza and Maria was at anchor; she had an anchor light the same as we. The light of the English bark could be seen a Swedish mile, equal to four English miles." Walter Le Rossignol, who was a mariner on the English bark, and was on watch at the time of the collision, says he went on watch at 1 o'clock. "The anchor light was burning brightly at the time, hanging in the foreyards, about twenty feet above deck. It could be seen more than a mile. About a quarter past two the light got dim, and I took it down and trimmed it afresh; was not three minutes doing it; at once hung it back in the same place; about ten minutes afterwards the steamer Everman ran into us." Peter Robinson, colored, watchman at the Old Point wharf, says that "he had seen all the time before the collision up to ten or twenty minutes before, a light on the bark Eliza and Maria. For ten or twenty minutes before he did not see it. He could see the lights on all the other vessels anchored near the Eliza and Maria, he could have seen hers if she had had it; she was the farthest off from him of the vessels he saw at anchor." The three witnesses who were on the Everman say that they did not see the anchor light before the collision. Such is the substance of the evidence on both sides relating to the anchor light. I think the weight of it is decidedly in favor of there having been a proper light, under the navigation laws of the United States, properly displayed on the Eliza and Maria. Evidence is offered on the part of the Everman to prove that on the second day after the collision (the 14th of September), young Rossignol (the lookout of the Eliza and Maria on the occasion) stated to two witnesses in Norfolk that at the time of the collision he was trimming the lamp in the ship's house of the bark. This evidence was offered for the purpose of contradicting this same witness's statement on oath, as found in his deposition taken on the 21st of September, 1872, that the light was up and burning brightly. But he was not informed before giving his deposition of the use that was to be made of his oral statement, alleged to have been made on the 14th of the same month; and on that ground I am obliged to exclude the evidence of this oral statement. Such statements by others of the crew of a vessel than master and owner are inadmissible evidence.

The authorities against such statements are Warburton v. Aken [Case No. 17,143]; U. S. v. Dickinson [Id. 14,958]; Chapin v. Siger [Id. 2,600]; Jenkins v. Eldredge [Id. 7,266]; 12 Grat. 484; [Conrad v. Griffey] 16 How. [57 U. S.] 38.

Looking to the preponderance of evidence, I am obliged to decide that a proper anchor light was shown by the Eliza and Maria at and for a sufficient period of time before the moment of collision. And even if there was not a light on the Eliza and Maria, the neglect on her part to show a light at night did not absolve the Everman from the duty of caution in moving in the harbor. [Pfister v. Greening] 9 Wall. [76 U. S.] 505; [The Maria Martin v. Northern Transp. Co.] 12 Wall. [79 U. S.] 31.

The only remaining inquiry is, whether the Eliza and Maria was anchored at a proper place. This was half a mile southwestwardly from Old Point wharf, directly in the track of steamers leaving that wharf for Norfolk, and near the usual track of vessels coming into Hampton Roads from Chesapeake Bay going to Norfolk. The following is the official description of the anchorage of Hampton Roads, furnished me by the superintendent of the United States coast survey:

"Anchorage in Hampton Roads.

"Hampton Roadstead is formed by the confluence of the James, Nansemond, and Elizabeth rivers, and is bounded on the north by Old Point Comfort and the Hampton shore to Newport News; on the east by a line drawn from Old Point Comfort lighthouse to Fort Wool, or the Rip-Raps, and continued to the west end of Willoughby Bank; on the south by Willoughby Bay and Sewall Point Spit; and on the southwest and west by a line drawn from Sewall Point to Newport News Point. Between these limits the roads are about four miles long, with a depth of from four to fifteen fathoms, and excellent holding-ground. At the eastern boundary the anchorage is three-quarters of a mile wide, and gradually widens toward the southwestward until abreast of the western end of Hampton Bar, where it is a mile and three-eighths wide, between the lines of three fathoms. The usual anchorage is between a line drawn from Old Point Comfort Lighthouse to Fort Wool (Rip-Raps), and another line drawn from the southwestern end of Hampton Bar toward Sewall Point until it strikes the western edge of Sewall Point Spit. These two lines, with the 'three-fathom curves' on the north and south shores, inclose a space nearly 2½ miles long (2 miles and 790 yards), about three-quarters of a mile wide at its eastern end (1575 yards), and 1⅛ miles wide at its western end, (1 mile 790 yards), with a depth of water varying from three and a half (3½) fathoms to a little over fifteen (15) fathoms, and of a bottom composed for the most part of stiff, tenacious blue mud. Vessels bound up the James River usually anchor off Newport News, either between 'Hampton Flats' and the 'Middle Ground,' or between the 'Middle Ground' and 'Crany Island Flats.' In either anchorage there is from three to four and a half fathoms at mean low water, the average rise of tide being 2½ feet.

"Note.—In all of the above distances the nautical mile is used, which ·is 2028 yards long, being greater than the statute mile by 268 yards. A scale of nautical and statute miles will be found upon the accompanying chart."

The position of the Eliza and Maria was near the eastern end of this "usual anchoring ground" at longitude 36 degrees 59 minutes 30 seconds, latitude 18 degrees, no minutes, 30 seconds. There was half a statute mile of deep channel on each side of the bark, and (certainly as to steamers) the place was as proper for anchoring as any other in the roads. If the collision had been made by a sail vessel coming into the roads before a strong head wind, which compelled her to tack in order to make her way in, then there might have arisen a question whether, as against a sail vessel thus compelled to tack to get into harbor, the bark lying near the centre of this channel, as near as half a mile from the entrance to it, was not in fault.

There are but two cases in the reports in which a court has held the vessel at anchor under such circumstances to be in fault; but there is no case in which the courts have thus held where the vessel entering a channel and colliding with another at anchor had been a steamer. One of the cases to which I refer is that of Strout v. Foster, 1 How. [42 U. S.] 89. In that case the supreme court of the United States was equally divided, and, consequently, affirmed the decision of the circuit court, presided over by a justice of the supreme court, which had reversed the decision of the district court of Louisiana. "The sailship Harriet, from New Orleans for London, had passed over the bar through one of the outlets at the mouth of the Mississippi river, and come to anchor near the bar. The sailship Louisville, lying below a distance of several miles, weighed anchor with a fresh and favorable wind for coming in through the same pass. As she approached the bar the wind died away, and the current being stronger than usual, owing to a steady wind from the south the night before, she drifted and ran afoul of the Harriet. These passes, it appears, are intricate and difficult to navigate, and subject to counter and undercurrents. If the wind die away when a ship is coming in, she is certain to drift and become unmanageable. Knowing these facts, a prudent master would never anchor his vessel in the thoroughfare of one of these passes. The evidence shows, however, that the master of the Harriet did anchor his vessel immediately in the thoroughfare, and that, too, after having been run afoul of by another vessel about a year before at or near the same place." Those were the facts of the case of Strout v. Foster [supra], as stated by the court, and yet, strong as they were against the anchoring vessel, the Harriet, the district and circuit judges differed with each other on the law, and the latter's decision prevailed only by virtue of the supreme court being equally divided, the justice who decided the case below being one of the divided court.

The other of the two cases I alluded to was that of The Scioto [Case No. 12,508]. The facts of the collision were thus stated by the court: "The Scioto, on the evening of the 15th December, 1874, being on her passage from Calais to Boston, deeply laden with a cargo of lumber, in consequence of the threatening aspect of the weather, put into the harbor of Portland. The wind was from the N.N.E., so that she could not lay her course in the harbor, but was obliged to beat in. Two other vessels were entering at the same time. As they entered the Scioto put in upon one tack as the other two did on the other, and each tacking at the same time, they passed each other in the channel. After making three or four tacks, the Scioto, in her passage from the eastern to the western side, came in collision with the Falcon, lying at anchor about forty rods northwest of the blockhouse on House Island, where she had been lying for a week. This was about one o'clock in the morning. The moon was then just setting, the sky moderately but not heavily overcast. Some of the witnesses say that stars were visible, and others that they were not. During the first part of the night there were flying clouds, sometimes obscuring the moon and sometimes leaving it brighter, but in the latter part the clouds became more dense and heavy. Still it was light enough to see objects at considerable distance which were broad off in the water, unless land lay behind, so that the shade of the vessel was melted into that of the land beyond. It was in such a position that the Falcon lay when seen from a vessel entering the harbor, the high land of the town covering her hull. She lay also in the channel or passageway, not precisely in the track of a vessel entering the harbor with a fair wind, but within the range taken by vessels beating in, and very nearly in the track of a vessel going into Hog Island Roads, and she showed no light. * * * The Falcon was not seen from the Scioto until she was so near that it was impossible to avoid a collision. * * * As she was approaching the Falcon another vessel beating into the harbor was approaching her betweeen the Falcon and the Scioto, and entirely concealing the Falcon, and she was first seen as soon as this vessel had so far passed as to clear her. The Falcon was not seen before the intervention of the third vessel, because she showed no light, and because she was within the shades of the land, her shade being lost in that of the land back of her. The Falcon had been lying in the same place for more than a week, and had within that time been struck by another vessel entering the harbor."

An essential element of difference between

this case and that of the Everman is, that the vessel at anchor showed no anchor light. It is true that this case arose before the act of congress prescribing rules of navigation in American waters, and for American vessels, as to lights, but it is also true that the general maritime law is as exacting in requiring an anchor light as our present navigation laws. Another difference is, that the Falcon was struck by a sail vessel beating into the harbor before an adverse wind. Another is, that she had been warned of being in an imprudent position by having been a week before struck by another sail vessel beating in the harbor in the same way. Another is, that a sail vessel struck her, and not a steamer, which latter is presumed to have a more complete and sudden control of herself that a sail vessel. But the principal element of difference is, that the thoroughfare of the entrance to Portland harbor was quite a different sheet of water from "the usual anchoring ground" of Hampton Roads. The entrance to Portland harbor where the Falcon lay is not as wide as the Hampton Roads are where the Eliza and Maria lay. In the case of the Falcon, all the experienced masters without exception who were examined said that it was not a fit place for a vessel to anchor in, unless in a case of necessity, but that it was a place of danger both to herself and other vessels that were entering into the harbor, and that no vessel anchoring there from necessity ought to remain there longer than the necessity continued. No such testimony has been given in the case before us. The Eliza and Maria was lying in the harbor within the limits of the usual anchoring ground of the harbor. The allegations as to her position are only that it was in the track of steamers making for Norfolk from Old Point wharf, and of vessels coming into the roads bound for Norfolk, but still there was a quarter to a half mile of deep channel on either side of her. The case of The Scioto is not of such established authority that it cannot be questioned in another court, high as the decisions of Judge Ware are acknowledged to rank in all the admiralty courts of the country. Only a week before, he had decided a case of collision with the Falcon, lying in the same position, in favor of the Falcon. But even if his later decision in favor of the Scioto were indisputable authority, the facts of the case differ so essentially from those of the case now under consideration, that I should refuse to be governed by it. There are, indeed, no decisions of any courts as to other harbors or the entrances to them which, either in their law or facts, forbid my deciding this case upon principles of justice, right, and sound maritime policy. A road or roadstead, in the commercial sense, and by the maritime definition, is "a place where ships may ride at anchor at some distance from the shore." In the very name, therefore, of Hampton Roads, is implied a place of anchorage, at a distance from the shore. The limits of this roads, this roadstead, this place of anchorage, are defined by the official statement which I have already given, as furnished by the superintendent of the coast survey of the United States. Is it for me, sitting here within sight of this great roadstead, to negative the historical and maritime character which it has so long borne, by pronouncing it a mere channel of navigation, and not a roads, not a place of refuge, safety, and anchorage for all vessels putting into it? I do not think so.

Upon principle, and for the purpose of establishing a just, liberal, and safe precedent, I feel that I ought to declare in this place, and on this occasion, that the anchorage of Hampton Roads is free for the use of all vessels at pleasure. Impressed with its value to the commercial world, I feel that it is not for me to deny the freedom of this harbor, and that it is my duty to proclaim, as far as the powers of my commission can warrant, that the capacious roadstead which nature has placed at our doors as a harbor and refuge for ships and mariners, is free of entrance and exit, of anchorage and harborage, for vessels navigating the seas, of every nationality and all flags.

I will give a decree against the Everman for damages according to the terms of section 3d of the act of March 3d, 1851, to be shared between the original libellants according to the terms of the fourth section of the same act.

The decree in this case was affirmed by the circuit court, [and was submitted to the supreme court November 21, 1878, and the decree of the circuit court for the Eastern district of Virginia affirmed, with costs and interest, November 25, 1878, no opinion being delivered. Case not reported.]