### THE ARMONIA.

### THE REDRUTH.

### PENCO v. CORY et al.

#### (District Court, E. D. Pennsylvania. April 8, 1895.)

#### No. 64.

1. COLLISION—VESSEL ANCHORED AT NIGHT—BURDEN OF PROOF.

While it is true, in general, that a vessel under way, which collides with one at anchor, is presumably in fault, yet the burden of proof is not upon her when it appears that the anchored vessel was in a channel at night, and the pleadings raise the question whether she was in a proper place, exhibited a proper light, and maintained a watch.

2. SAME.

Where a vessel anchored in a channel at night was run into by a vessel under way, held, on the evidence, that the anchored vessel was in a proper place, had up a proper light, and maintained a watch; and held, therefore, that the moving vessel should be presumed to have been in fault, and that it was unnecessary to determine in what the fault consisted, more particularly than that she failed to keep away, as her duty required.

This was a libel by Domenico Penco, master of the bark Armonia, against John Cory & Sons, owners of the steamer Redruth, to recover damages resulting from a collision.

Edward F. Pugh and Henry Flanders, for libelant.
Convers & Kirlin, for respondents.

BUTLER, District Judge. The ship collided with the bark while the latter was at anchor in Delaware Bay, about a mile eastward of the buoy on the lower end of Joe Flogger Shoal, April 21, 1893. The tide being ebb the bark swung head upward. The ship was passing down, and in an endeavor to cross the bark's bows, when very near, struck her forward, inflicting damage, severing the anchor chain, and setting her adrift.

The libel asserts that the bark was anchored where such vessels customarily lie; that the proper light was up; that a vigilant watch was maintained; and that the collision was the result of the ship's fault alone.

The answer denies these allegations, charging that the bark was anchored in mid-channel, that she had no light and no watch.

If the bark was anchored in a usual place for such vessels, had the required light, and maintained a proper watch, there is no room to doubt the respondents' liability.

It was her duty to keep off, and under such circumstances she can have no excuse for not doing so. There is no suggestion of inevitable accident, nor anything to warrant it.

The evidence respecting the light, and place of anchoring, is conflicting and irreconcilable. If the burden of proof in these respects, was on the respondents, I would have no hesitation in deciding against her. I incline to believe however, indeed I do believe, that it is not. It is common to say, where a vessel under way collides with one at anchor, that she is presumably in fault; and this is usually true. Where, however, the anchored vessel is in a channel, after night, and the question whether she was in a proper place, exhibited a light and maintained a watch, is raised by the pleadings, the burden is I think on her.

As respects the question of watch I have no difficulty. The evidence shows that a watch was maintained, with customary vigilance. The watch's duties are not those of a lookout. They are well described by the pilots of both vessels. If a light was up the watch had nothing to do but see that it was kept bright, and report any change in the situation of the vessel or surrounding circumstances which required attention. It was not his duty to exhibit a torch to approaching vessels, or in any other way attempt to supplement the warning which the light afforded. Such an attempt would be as likely to do mischief as good.

As respects the question whether the bark was anchored in a proper place, I have little difficulty. The channel at this point is two miles wide, for deep draught vessels; and the rules applicable to narrow waterways are therefore inapplicable. Whether she might anchor anywhere in the channel, and whether the statutes of Delaware apply to the locality I need not decide. She was not on the "range lights," for there are no such lights here. I am satisfied she was anchored to one side of mid-channel, and where such vessels customarily lie. Pilots Maule and Long, respondents'

witnesses, admit that vessels anchor about the fourth of a mile from the center. The witnesses most likely to know where she was are her pilot and officers. It was the duty of the pilot, who was familiar with the locality to select a proper place; his own safety and his duty, as well as the safety of the vessel and her crew, required this. He and others on board testify that he went over towards the western side about the fourth of a mile from the center, and there anchored, where such vessels usually lie. The testimony on the other side is unsatisfactory; the witnesses from the ship judge she was in mid-channel because they found her in their front. But it is fair to presume that they do not know whether they were in mid-channel or not. There was no necessity to run there, and they were as likely to run to the one side or the other as not. Their subsequent recollections respecting it are unreliable. The conclusion formed from finding the bark near mid-channel when the ship returned, after the accident, is unjustifiable. When the anchor chain was broken she drifted with the tide, and was as likely to go to mid-channel as elsewhere.

The question of light is much more serious. The witnesses on each side are numerous, and their statements are so contradictory that it is difficult to avoid the conclusion that some of them have intentionally falsified. The witnesses from the bark testify, some of them, that they prepared and hoisted the light when she anchored; others that they saw it up repeatedly during the night, and also directly after the accident and later in the morning. The several individuals who constituted the watch at different periods of the night, and whose duty it was to observe the light, all say it was up, burning brightly. Roland, a pilot, who passed down in charge of a vessel an hour or more before the collision, says he saw the bark at anchor with the usual light up. On the other hand witnesses from the ship say no light was up; that the bark was in total darkness, no light being exhibited anywhere. They say also that after passing they saw an anchor light put up; that it was carried from the stern forward and hoisted. There are several circumstances that tend to cast suspicion on this testimony. It seems incredible that no light whatever should have been up on the bark. The witnesses contradict each other respecting the time when a light was carried forward and hoisted. When the pilot and master, or mate, came aboard the bark, after the ship's return, they did not complain that no light was up, but that it was dim; and according to the statement of the original answer filed, this was their complaint subsequently. It is there said, and solemnly sworn to, that such was the bark's fault, in this respect; not that no light was up, but that it was smoked and dim. It is impossible to explain away such a fact, as the respondents now seek to do. Then again it seems incredible that the bark would thus hoist a light in the faces of these witnesses, upon whom she desired to impose a belief that the light was up before the accident. It would be the plainest admission of fault. The several witnesses from aboard the bark testify that no light was hoisted after the collision; but that a light was carried from the stern forward, to

examine the injury sustained; and that this is the whole foundation of the story that a light was put up after the accident. The witnesses from the ship are corroborated by the testimony of Pilot Maule, who says he passed down shortly before the collision, and saw a vessel at anchor in this vicinity without an anchor light, that he did not recognize her as the "Armonia" or know who she was, but that he saw no other vessel at anchor near; that he spoke of the fact on reaching his destination; and it is testified that he did so speak. This testimony is certainly important; but it is not more so than that of Pilot Roland who says he passed down a little earlier and saw the bark at anchor, recognized her, and that her light was up burning brightly. Of course, it is possible that Mr. Maule saw another vessel, but this is not probable. What is remarkable, however, is the fact that he too says the vessel had no light whatever —a statement that it is difficult to credit. The ship's forward lookout testifies that he saw three lights ahead when approaching the vicinity in which the bark lay, two large ones, apparently shore lights, and one small, apparently a vessel's light, which he reported to the pilot. When asked the direct question whether the latter was on the bark he said, "No." But how could he know? He did not see it elsewhere, and says he did not observe it after passing. The pilot recollects the report, but explains that the light was not on the bark. The explanation, however, is not very satisfactory.

I will not pursue the inquiry. It is sufficient to say that after careful examination and reflection I am convinced that there is a decided preponderance of evidence in favor of the libelant's allegation that the light was up; and I therefore, so find the fact. It results that the ship must be condemned—that she had no excuse for colliding with the bark. It is true that those on board testify to a full discharge of duty, as is common in such cases; but this testimony cannot be credited, in view of the collision, under the circumstances stated. While it is unnecessary to determine what the ship's fault consisted in, more particularly than that she failed to keep off, I incline to believe that it was in her failure to give proper attention to the report of her lookout.

I see nothing in the suggestion that the bark should have changed her position when the danger became apparent. She could not do so without raising her anchor and this required time—much more than the circumstances afforded.

A decree must be entered for the libelant.