## THE LE LION.

### THE ATLAS.

### PHINNEY v. THE LE LION.

### DUMONT v. THE ATLAS.

(District Court, E. D. Pennsylvania. February 11, 1898.)

#### Nos. 77 and 80.

1. COLLISION—BARGE ANCHORED IN CHANNEL.
    A barge may properly anchor for the night near the middle of the channel of Delaware Bay, inside the capes, where it is four or five miles wide.
2. SAME—STEAMER WITH ANCHORED BARGE.
    An anchored barge, which was run into by a steamer shortly after Act Feb. 19, 1895, prescribing one anchor light instead of two, will not be held in fault for having two lights, when the steamer saw only one, and therefore could not have been misled by the other.
3. SAME—BURDEN OF PROOF.
    The rule that a vessel, clearly shown to be guilty of fault adequate of itself to account for the collision, has the burden of clearly proving contributory fault by the other, is peculiarly applicable where the other was at anchor, since there is a presumption in favor of an anchored vessel, and a presumption of fault on the part of a vessel running into her.

This was a libel against the master of the barge Atlas against the steamship Le Lion, and a cross libel by the master of the latter, to recover damages growing out of a collision.

Horace L. Cheyney and John T. Lewis, for the Atlas.
H. R. Edmunds, for the Le Lion.

BUTLER, District Judge. About 8 o'clock of March 24, 1895, the barge, in tow of the tug Shawmut, on her way from Boston to Philadelphia, anchored in the Delaware Bay, inside the capes, near the center of the channel,—which is upwards of four miles wide at this point. She put up the usual white light forward, and left her stern light, which had been up previously, burning. The tug anchored the fourth of a mile further up. A proper anchor watch was set upon the barge, and she remained in this situation, her stern swinging up stream, with the incoming tide, until near midnight. At that time the steamship, which was also coming up to Philadelphia, ran into her.

For the injury thus inflicted the barge libeled the steamship, and the latter subsequently libeled the barge for injury sustained by herself.

Is the steamship responsible for the collision? Unless the barge was guilty of fault which tended to it, this question must be answered affirmatively. She was near midway of the channel, as stated, which is from four to five miles wide, where vessels customarily anchor, and very near where the steamship anchored soon after. Her position was not therefore improper. In such a water way, vessels are not required to anchor near the sides. The Redruth, 67 Fed. 362; Id. [26 C. C. A. 338], 81 Fed. 227; The Indiana, Abb. Adm. 330 [Fed. Cas. No. 7,020]; The Continental, 3 Woods, 32 [Fed. Cas. No. 3,460]; The Oscar Townsend, 17 Fed. 93; The S. Shaw, 6 Fed. 93; The J. W. Everman, 2 Hughes, 17 [Fed. Cas. No. 7,591]; The Lady Franklin, 2 Low. 220 [Fed. Cas. No. 7,984]. She had a good anchor light, which was seen from the steamship when a quarter of a mile away, and could and should, I think, have been seen earlier. The pilot of the steamship says it was a "good bright light" and that he saw it the distance stated. She had, as before remarked, the usual anchor watch set, which appears to have been vigilant in discharging its duties. She did not sound a fog horn, as it is said she should, but the circumstances did not require it. Other vessels in the vicinity, including the steamship, did not sound fog horns, and the pilot of the steamship says it was not necessary, as he could see a light 400 yards or more away. It is now urged, however, that the barge had two lights up, while the Act Feb. 19, 1895, then in force, requires one, and excludes all others. Prior to March 1, 1895, when this act went into force, two lights were required, and as the collision occurred only three weeks later, it was still common to have both up, as the testimony indicates, in ignorance, doubtless, of the law. The exhibition of the second light was a fault. The steamship's complaint of it, however, comes with a very bad grace in view of the statement in her answer and cross libel, that she did not, and could not, see it,—in fact that the barge had but one light up, while it was her duty to have two, and that she, the steamship, was in consequence misled; and especially in view of her testimony, that the second light was hoisted after the collision occurred, as her crew saw. Her case was tried on the issue raised by this statement. It was not until the testimony had been taken, and the case presented for final hearing, that the steamship discovered the fact that Act Feb. 1895, had gone into operation before the collision. Then she changed her complaint, which up to that time, as before stated, had been, that the barge exhibited but one light while she should have shown two. The change does not improve her position. The barge's fault had no influence whatever in producing the collision,—could not possibly have, as the evidence demonstrated. The steamship did not see the second light; she not only says so, over and over, but calls numerous witnesses to prove it. Her movements were not therefore affected by its existence; and the neglect to take it down, when the vessel anchored, as she should have done to comply with the statute, is unimportant.

Having found the barge to be faultless, as respects the collision, it follows that the steamship must be held responsible for not keeping

off. This would be so even if the evidence failed to disclose the particular fault that caused the disaster. The evidence does, however, disclose it. Passing by the question whether a single man on duty as lookout was sufficient under existing circumstances, as she states them (and it may be remarked that in the light of The Oregon, 158 U. S. 186 [15 Sup. Ct. 804], and the cases there cited, I think he was not), the evidence shows that while the light should have been seen earlier than it was (as is demonstrated by the fact that the light on the tug, a quarter of a mile further up was seen at the same time, as the steamship pilot testifies) it was nevertheless seen in ample time to enable the steamship to keep off. Her fault consisted in going so near the barge as she did, with the light in view, before changing her course and then changing it in the wrong direction. When she first saw the barge her course was to the starboard of that vessel. There is no room for doubt of this. Her lookout so testifies and so signaled; and he is corroborated by two other members of the crew who heard and understood the signals. Her change of course to port seems to have been a blunder resulting from misunderstanding of signals or orders. Without any change she would probably have passed safely, —with very little change to starboard, she certainly would. Why should she therefore desire to run across, and go up the other side? The pilot, apparently in excuse for turning portward, says he thought the barge was off a little to starboard. Of course she was not, as the collision itself demonstrates. If she had been, no collision could possibly have occurred; the turn to port would have taken the steamship directly away from the barge. The pilot, apparently in further excuse of himself, says he did not give the order; that the mate gave it. This officer was not examined; possibly his presence could not be procured. His explanation might be interesting. The following language taken from The Oregon, supra, is as applicable here as it is there:

"Where one vessel, clearly shown to have been guilty of fault, adequate in itself to account for the collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributory fault. This principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor from the fact of her being at anchor, but a presumption of fault on the part of the other vessel, which shifts the burden of proof upon the latter."

The barge's libel must be sustained and the steamship's be dismissed, in each case with costs.