## Case No. 2,261.

### BUZZARD v. The PETREL.

[6 McLean, 491;[1] 18 Law Rep. 185; Brun. Col. Cas. 589.]

Circuit Court, D. Michigan. June Term, 1855.

COLLISION—DRIFTING VESSEL AND VESSEL AT ANCHOR—LOOKOUT.

1. All vessels are required to use reasonable diligence to avoid collisions.

[Cited in Wells v. Armstrong, 29 Fed. 220.]

2. A vessel anchored in a river having a rapid current should keep a watch.

3. A sail vessel, in descending the river when there is no breeze, will be carried by the current, and will not obey the helm. In such case the vessel anchored in the current, by porting her helm, may avoid the floating vessel.

[Cited in The James M. Thompson, 12 Fed. 195.]

4. If no watch be kept, under such circumstances, by the anchored vessel, and a vessel descending the river floats against her, not being under the command of her helm, and her captain and crew by outcry endeavored to give notice to the crew of the anchored vessel, no damages for an injury done can be recovered. Under such circumstances, the omission to station a watch on the anchored vessel, amounts to negligence.

[Followed in The Johannes, Case No. 7,332. Cited in The Lady Franklin, Id. 7,984; The Delaware, 12 Fed. 574; The Oliver, 22 Fed. 851.]

[Appeal from the district court of the United States for the district of Michigan. [In admiralty.]

Mr. Miller, for appellant.

Walker & Russel, for defendant.

McLEAN, Circuit Justice. This is an appeal from the decree of the district court in admiralty.[2] The scow Petrel and her boats, tackle, apparel and furniture were attached on a libel filed by the plaintiff [Levi Buz-

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Case not reported.]

zard], as owner of the schooner Avenger, which is a vessel of more than twenty tons burthen, viz., seventy tons; that said schooner, being on a voyage from port St. Clair to the port of Detroit, had come to anchor on the St. Clair river below Newport, was carelessly and negligently run into and damaged by the scow Petrel, &c.

The collision is not controverted, though in the answer the manner of describing it in the libel  is denied. It appears that the Avenger got under way from St. Clair, about dark, in December, 1852, being loaded with lumber, and drifted down the river to opposite the mouth of Belle river, where she came to an anchor, as the witnesses of the plaintiff say, nearer to the American than the Canada shore; other witnesses considered her in the channel, very near the middle of the river. It was a bright moonlight night [so that objects on the river could be seen at a great distance].[3] At about twelve or one o'clock at night, the scow Petrel, in descending the river, struck the Avenger on the starboard bow, at the cat head, her jib-boom entering between the foremast and fore rigging of the schooner. The two vessels then dragged down [the river at a short distance].[3] The Avenger lost an eye bolt and a flying jib-boom, guys, and one of her martingale back ropes; also, two stanches, a chalk plate and a piece of her sail. The captain of the scow came on board and wanted, as some of the witnesses say, while others state differently, to cut the rigging of the schooner, which the captain of the schooner would not permit; but an anchor was thrown out astern. The object was to bring the schooner's head round, but there being no windlass, there was nothing to which the chain or rope of the anchor could be fastened, which could resist the force of the current, and the anchor, hawser and line were lost. But the vessels were shortly afterward separated and the scow sheared off. The captain of the scow states that he was descending the St. Clair river on the night of the collision, that he remained on deck until between twelve and one o'clock, and seeing the watch on deck, went below, where he had not been more than half an hour when he heard one of the deck hands say that there was a vessel down the river to leeward. The captain then came on deck, and seeing that there was no wind, the man forward was ordered to let go the anchor. When he left the deck, there was a breeze sufficient to give steerage way, but when he returned to it, there was no wind. The anchor being let go, they payed out twenty to twenty-five fathoms of chain. At this time the Avenger was off from a quarter to a half mile. Perceiving that the chain would not bring the Petrel up, the captain got up on [the highest part of][3] his vessel—loaded with lumber—so that he could see the Avenger. He hallooed as loud as he

[3] [From 18 Law Rep. 185.]

could to the men on board of the sloop to shift their helm. The scow was then drifting down the middle of the river. Other men who were also forward continued to halloo to the men on the schooner to shift their helm. After the chain was all payed out, it was found the anchor would not hold the Petrel, it then being about a quarter of a mile from the Avenger. The hallooing was continued on board the Petrel until it was within a very few yards of the Avenger, and in the act of running into her. The mate of the Petrel was at this time on the deck and at the helm. The helm, in going down the river, was hard to port, to try and get the vessel to the American side, but there was not wind enough to allow her to mind the helm. When the jib-boom was nearly or quite over the Avenger, the captain saw a man jump out of the cabin of the Avenger and cry out there was a vessel running into them. Previous to this he had neither heard nor seen any one on the Avenger. At this time some four or five persons came out of the cabin. The scow struck the schooner on the starboard bow.

The supposition that there could have been a watch on the Avenger, is inconsistent with the facts as proved by several witnesses. If a watch had been asleep on the deck, he must have been awakened by the outcries of the persons on board the scow, as they approached the Avenger. No person was seen on deck until the moment of contact, which was too late to avoid the mischief. Had the helm of the schooner been shifted [in time][3] it is urged, the scow would not have struck it. The stress of the argument in behalf of the libellant is, that there was on board the scow a larger anchor, which, if it had been thrown, would have arrested the drifting of the vessel. Such an anchor was on board the scow, but the smaller one, it seems, was generally used, which was thrown. Whether this was negligence on the part of the commander of the Petrel, depends upon the circumstances under which he acted, and the degree of vigilance required by the colliding vessel. Before this point is considered, it may be well to inquire what duties, if any, were imposed by usage or otherwise, on the anchored vessel. That the Avenger was in the channel of the river, is proved by the floating of the scow. For want of wind the scow refused to obey her helm; she therefore followed the course of the current and ran into the Avenger. The excuse of the captain of the schooner for not approaching nearer the American shore, was that the wind had lulled and the vessel could not be so directed. It was, therefore, anchored in the channel, and consequently subjected to greater danger from descending vessels, carried by the current. At the place of anchorage, the current ran at from six to seven miles an hour. It is proved by experienced commanders and seamen well acquainted with the navigation of the St. Clair river, that what is called an anchor watch, is necessary when the vessel is anchored in the current. That when there is no current, such watch is not usual or necessary. And this usage is shown by a majority of the witnesses, and by those who are most experienced in the navigation of the river. The propriety of this usage appears from the occurrence under consideration. Had the Avenger been anchored out of the current, the collision could not have happened. The master of the schooner Fortune, in his deposition, says that a watch on board a vessel anchored in the current, is necessary for the "safety of the crew and of others navigating the river."

It seems that in descending the river, the captain of the Petrel was on deck, with others, until between twelve and one o'clock; that he then left the deck and went below, where he had not remained more than thirty minutes before he returned to the deck, having heard some one say there was a vessel ahead. He saw the vessel ahead to the leeward, at a distance of from a quarter to a half mile. He directed the bow anchor to be thrown, with the view to stop or retard the movement of his vessel. But the anchor dragged by the force of the current. Seeing this, the captain ascended to the highest part of his vessel, and by an outcry endeavored to arrest the attention of the persons on board the schooner. And as they approached the schooner, to the outcry of the captain, several of the crew joined in the request to shift the helm of the schooner. But there was no response made by those on board the schooner, nor were they apprised of the approach of the Petrel until she was in contact, when nothing to prevent the collision could be done. From the known usage to keep an anchor watch, when a vessel is moored in the current of a river, the captain of the Petrel had a right to expect the usual watch was kept, and that the helm could be so shifted as to avoid the collision. With this presumed knowledge, the conduct of the Petrel must be examined. On approaching the Avenger, the captain, and mate, and some others, were on deck. The anchor which had been thrown must have retarded the vessel, but it was not under the command of the helm, and they expected by their outcries to arouse the crew of the Avenger, until they had approached too near to arrest the floating of the Petrel by casting the large anchor.

The rule is a reasonable one that the moving vessel is to avoid a collision. But this is founded on the supposition that the vessel is under the command of her helm. Where this is not the case, the reason of the rule fails, and the obligation imposed by it. The officers and crew of the Avenger were all below, without a watch, and some of them, as stated, were about to retire. This showed great remissness in those who had charge of the schooner, especially as she was at anchor in

the current of the river. Reasonable care was required from the captain and crew of the Petrel to avoid the collision, and this they seemed to have exercised. An extraordinary effort, under ordinary circumstances, is not required. [Indeed it is not perceived that under the greatest emergency anything could have been done by the captain of the Petrel which was not done, except to cast the large anchor.][4] During the twenty minutes that the captain remained below, after midnight, the breeze subsided, which was felt when he left the deck, so that when he returned, on hearing there was a vessel ahead, the Petrel was floating on the current, and her direction could not be changed by her helm. On perceiving this the working anchor was cast and the chain paid out, and the outcry was made. This was at least reasonable diligence, and all that could be necessary for the safety of the schooner was, that her officers should also have used ordinary vigilance. Having failed to do this, her owner can have no claim against the Petrel for damages.

The judgment of the district court is affirmed.