## THE JAMES M. THOMPSON.

(*District Court, S. D. New York.* April 5, 1882.)

1. COLLISION—NARROW STREAMS—DILIGENCE TO AVOID DANGER—SIGNALS.

In navigating a narrow stream choked with vessels on either hand, active diligence to avoid collisions, and the use of all available means, including the giving of prompt signals in case of apprehended danger, are among the obvious and ordinary duties of navigation.

2. TUG AND TOW—ENTERING NARROW STREAMS—DUTIES OF.

Where the steam-tug S., with a tow lashed to her starboard side, entering Newtown creek upon the southerly side, was followed at a short distance by the steam-tug J. M. T., towing upon a hawser a light loaded scow of more than twice her breadth, and the S. having crossed the creek in front of the J. M. T., but not having room to come round against the flood tide for the purpose of landing her tow, came at rest in a position nearly directly across the creek and occupying nearly the full half of its width, and the J. M. T. passed within 10 or 12 feet of her stern, when the S.'s propeller was seen backing water, and the pilot of the J. M. T. then apprehended a collision with the scow if the S. did not stop backing, but gave no danger signals and kept on his course in order to pass through the draw-bridge just above, and then open, and there being no other reason for not slacking speed or stopping than the alleged fear of fouling the hawser or approaching other vessels, and a collision ensued between the scow and the S., *held*, that the J. M. T. was in fault for not sounding danger signals when the danger was perceived, and for not slacking speed or changing her course. *Held, also*, that the S., having the use of her motive power, was not entitled to the immunities of a vessel at anchor, though for the moment at rest, but was in fault for neither proceeding somewhat further ahead when occupying nearly half the stream, which it appeared she was able to do, or, if unable to do so, in not sounding danger signals to give notice to the other tug and scow of her inability to proceed. *Held, also*, that the scow was in fault, having a pilot of her own, with good steerage way, for

not porting her helm, though the danger was previously obvious, until within a few feet of the S., it appearing that by porting a little earlier the collision would have been avoided.

3. CONTRIBUTORY NEGLIGENCE—NO DEFENCE.

Though the collision might have been avoided by either of the other vessels, the negligence of either is no defence to either of the others in failing or neglecting to use the means at her own command to avoid it.

This was an action for damages to the tug-boat Skeer through a collision in Newtown creek in the afternoon of February 5, 1880, with the lighter Acme, then in tow of the tug James M. Thompson. The place of collision was at least 200 feet below the bend in the creek, and about 900 feet above its mouth. The creek at this point is shown by the chart and by the testimony to be at least 300 feet wide from bulk-head to bulk-head. It was lined by vessels lying abreast of each other on both sides, which diminished the space available for navigation from 35 to 60 feet on each side. The Skeer, 100 feet long, had entered the creek from the East river with a strong flood tide, and with the canal-barge Donnan lashed to her starboard side, and was about 300 feet in advance of the steam-tug James M. Thompson, which had the Acme in her tow upon a hawser 120 feet long. The Skeer, designing to land her tow upon the north side of the stream, had entered the creek close to the southerly shore, and shortly after she turned to cross the creek, designing to round to against the flood tide. In doing so she passed in front of the Thompson, but without interfering with the latter's course. The tow projected about 10 feet forward of the Skeer and when she had reached the northerly side of the creek she came to a stop, lying then about square across the river, and her tow being about eight or ten feet off from the boats moored at the bulk-head, and the stern of the tug being from 140 to 145 feet out in the stream from the northerly shore. The James M. Thompson was intending to pass with her tow through the southerly draw of the bridge, about 700 feet above the place of collision. She came up the center of the stream and blew one whistle as the Skeer crossed in front of her, continued on her course unchanged, and passed the Skeer at a distance variously estimated from eight to twenty feet. She was 17 feet wide. The Acme, her tow, was a scow 38 feet wide, light loaded, with square bows; and in attempting to pass the Skeer the port corner of her bows struck the port side of the Skeer upon the round of her stern from three to five feet only from her stern post. The tide at the time was running up at the rate of from two to three knots, setting

towards the northerly shore till beyond the bend, where it is deflected towards the southerly shore. The Thompson was under a slow bell, going at the rate of four or five miles per hour, or about two to three knots faster than the tide. On the part of the respondents it was claimed that the collision arose through the backing of the Skeer after the Thompson had passed her. The libellant denies that she backed at all.

*E. D. McCarthy*, for libellant.

*Thos. C. Campbell*, for tug James M. Thompson.

*Scudder & Carter* and *Geo. A. Black*, for scow Acme.

BROWN, D. J. In navigating a narrow stream, choked with vessels on either hand, active diligence to avoid collisions and the use of all available means, including the giving of prompt signals in case of any apprehended danger, are among the obvious and ordinary duties of navigation. *The Scots Greys*, 5 FED. REP. 369; *The Jessie Russell*, Id. 639; *N. Y. etc. Steamship Co.* v. *Calderwood*, 19 How. 241, 246. When such accidents occur in broad daylight, it is usually through the neglect of these duties by both parties, as I think is plainly shown in this case.

1. I am not entirely satisfied that the James M. Thompson was not in fault for taking her tow into unnecessary proximity to the stern of the Skeer. The latter had crossed the stream intending to round to against the tide in the usual manner, and became nearly or quite at rest, with the bows of her tow within eight or ten feet of the boats beside which she designed to moor. This was in full view of the Thompson, which came up from behind, and the intention of the Skeer to dock her tow was sufficiently apparent. Her stern lay about 145 feet out into the stream, within a few feet of the middle. There was at least 100 feet between her and the outside of the boats moored upon the opposite shore, leaving "ample room," as the answers admit, for the Thompson to pass the Skeer. Yet the Thompson passed, as I find from the evidence, only from 10 to 12 feet astern of the Skeer; and this course, even without taking into account any influence of the tide in setting her shorewards, was enough to draw the Acme, which was 21 feet wider than the Thompson, directly against, or very near, the stern of the Skeer, unless the Thompson was pulling towards the southerly shore. The pilot of the Thompson testified that he was so heading, and as much to the southward as he could and avoid some vessels moored at the bulk-head; but this is not consistent with the testimony of Callahan, a disinterested witness upon the bridge, who says she was heading directly up the middle of the

stream; nor is it apparently consistent with the previous testimony of the pilot, wherein he said that he did not change his course at all when the Skeer crossed the stream ahead of him. But, aside from this point, the pilot testifies that he saw the wheel of the Skeer commence backing water as soon as he had passed her, and that he then thought there would be a collision unless the Skeer stopped backing water; nevertheless, he gave no signal of danger, though he had gone so near the Skeer himself and was drawing a tow 21 feet wider, because, as he says, he "thought the pilot of the Skeer would see the tow and keep out of the way." Whether the Skeer actually made any stern-way or not is a question not free from doubt. Callahan, a disinterested witness, called for the defence, observing from the bridge, and who thinks the Skeer made some stern-way, testifies that if she had remained still it would have been "a close shave" for the Acme to pass by.

But a steam-vessel has no right unnecessarily to make "a close shave" upon another. The Revised Statutes of this state, (1 Rev. St. p. *684, § 7,) in providing that "whenever any steam-boat shall be going in the same direction with another steam-boat ahead of it, it shall not be lawful to navigate the first-mentioned boat so as to approach or pass the other boat, so being ahead, within a distance of 20 yards," though laying down a rule which cannot be literally applied in a narrow creek like this, is nevertheless based upon and recognizes a general obligation to keep at a reasonable distance, according as circumstances shall permit. It was therefore the manifest duty of the pilot of the Thompson, when he saw that the Skeer with her tow was quite near to the boats at the bulk-head, and was evidently engaged in docking her tow, and when, as he testifies, he feared there might be a collision unless she stopped backing, to stop himself, unless it was clear the Acme could pass, and to sound danger signals, so as to give notice both to the Skeer and to the Acme that they might govern themselves accordingly. Had such signals been given, there is no reason to suppose the Skeer would not have stopped backing, if in fact she had any stern-way, nor that the Acme would not have ported her helm much sooner than she did, which would doubtless have been sufficient to avoid the collision; nor does any reason appear why the Thompson could not have stopped her engines until the Skeer was passed by the Acme. The excuses given are plainly insufficient. There was no more danger to the tow or to the Thompson in stopping before the collision than in stopping after it, as they did, when neither of them sustained

any injury by so doing. There can be no doubt that by slackening speed and signaling, the Thompson would have avoided the accident, and nothing prevented her doing so. Unless, therefore, the pilot of the Thompson, seeing the danger which he confesses he apprehended, can be absolved from all obligation to do anything to avoid a threatened collision, the tug must be held in fault. He was bound to use all available means to avoid accident; and the Thompson must therefore be held in fault, if not for going too near the Skeer, at least for doing nothing to avoid the collision when the danger was perceived, either by signaling or changing her course or stopping her engines; all of which she might easily have done.

2. The Acme would not be held in fault if it did not clearly appear that her pilot was also negligent in the use of the means at his command to avoid the collision. She was light loaded, easily steered, and had good steerage headway, according to his own testimony. She was upon a course which, by all the testimony, must have drawn her port side very close to the Skeer, and the tide also was setting her towards the latter. Her pilot also claims that he saw the Skeer backing, which would bring her still more in his way; yet he made no shout, and made no attempt to change his course, according to his own testimony, until within 10 feet of the Skeer. He claims that this change carried the Acme somewhat to starboard. All the other witnesses testify that he continued on a straight hawser, on a line with the Thompson, without change; while the pilot admits that the Acme could have sheered at least 20 feet by porting, and that she answered her helm quickly; though he says that he had not sufficient room to starboard for doing so; but the other evidence shows that there was abundant room for that purpose.

The place of the blow upon the stern of the Skeer shows that by going a very few feet further to starboard the Acme would have cleared her, and this she could very easily have done by steering so as to avoid her. The same rule, therefore, which requires every vessel to use whatever means are in her power to avoid a collision, requires the Acme to be held answerable for this neglect.

Though it was thus within the power of the Acme to avoid this collision, the Thompson cannot be held on that account discharged, any more than the Acme can be held exempt, because the Thompson might have avoided it by going further off, or backing or stopping. Neither is exempted by the remissness of the other.

3. The Skeer must also be held in fault, whether she was actually backing her engines so as to acquire stern-way or not. The weight of evidence is undoubtedly to the effect that her engines were backing. The greater number of witnesses assert also that she had acquired some stern-way; but, if she had any, it must have been very slight. The pilot of the Thompson is not sure that she had any. His deck hand, who was watching, thinks she may have made five feet stern-way up to the time of the blow. All the other witnesses agree that she did not commence backing till shortly after the Thompson had passed her. The Acme, upon a hawser of 20 fathoms, would be but little over 100 feet astern; and, as she was moving through the water at the rate of at least a couple of knots, she must have reached the Acme about half a minute after the Thompson had passed. Evidence was given that no stern-way could be acquired by the Skeer with such a tow as she then had in less than from 35 to 45 seconds; and the testimony, of the engineer of the Thompson rather supports this estimate.

I should not feel warranted, therefore, in holding the Skeer liable upon the ground that she backed into the Acme, as claimed, as that is at least doubtful upon the whole testimony; but she must be held chargeable with negligence in doing nothing to avoid an impending collision when the danger of it was obvious, if any proper lookout was kept, and when she was occupying so much of a narrow stream. *The Baltic*, 2 Ben. 452, 455. She was looking, doubtless, towards landing her tow; but she cannot on that account be excused from observing what was going on about her. Her stern lay within a few feet of the middle of a narrow creek. The scow behind was high out of the water, and upon a course which, whether the Skeer was still or backing, was alike dangerous. The Skeer was not in the situation, nor entitled to the immunities, of a vessel at anchor. She had the full use of her motive power; her engines were in motion; and she must, therefore, be held to the same rules of diligence that apply to other vessels passing each other or having command of their own movements.

From the narrowness of the stream and her inability to come round, lying almost directly across the creek and occupying very nearly the full half of it, if the Skeer was unable to proceed further in shore, or to fasten her bows at once so as to allow her stern to swing further to shore, one or the other of which it would naturally be expected she would do, it was her obvious duty to give danger signals like-

wise, and I doubt not she would have done so had any attention been paid to the scow. *O'Neil* v. *Sears*, 2 Spr. 52; *The Petrel*, 6 McLean, 491; *The Lady Franklin*, 2 Low. 220. No explanation is given of the alleged backward motion of her engines, because this backing is denied. Nor does any reason appear why she did not move somewhat further in shore, as she might and naturally would have done if the danger was noticed, having at least 10 feet space to do so. Had she observed the course of the Acme, as she was bound to do, and given signals of warning, as she also should have done if she could not get further out of the way, or was not intending to proceed to the dock, as it was supposed she would do, it must be presumed that the other vessels, one or both of them, would have understood that she could not do anything more to get out of the way, and would have been more diligent in using their own means of avoiding her. Instead of doing so, she appears to have attended solely to her own maneuvers, and either failed to observe the Acme at all, or relied exclusively on the other tug and tow to keep out of the way, precisely as the Thompson relied on the Skeer to keep out of their way. The rule which requires all parties to use with diligence all the means at their command to avoid accidents, thus applies, though in different ways, to all the three vessels.

The libellant is therefore entitled to judgment for half his damages and costs.