## THE HENRY WARNER.[1]

*(District Court, D. Massachusetts. December 11, 1886.)*

1. COLLISION—VESSEL AT ANCHOR—DANGEROUS ANCHORAGE—FAILURE TO KEEP LOOKOUT.

When a vessel is at anchor in a place where other vessels are frequently passing, and where navigation is difficult and dangerous, special care and vigilance, in order to give warning of her presence to passing vessels, is required. She must have a good lookout, and an anchor light of the regulation pattern lit and burning; to have a watch on deck is not sufficient, if there be no one on lookout at the time of the collision.

2. MARITIME LIEN—ADVANCES TO PAY WAGES AND STEVEDORES' BILLS—ASSIGNMENT OF CLAIMS TO PAYEE.

One who advances money to pay debts which are liens, and who takes an assignment of the claims, is not entitled to look to the fund arising from the sale of the vessel, after he has been actually repaid, or if circumstances exist from which payment must be presumed.

Collision. Libel *in rem* by the owners of one of the colliding vessels and the underwriters of her cargo against the other vessel and her freight.

*L. S. Dabney* and *H. Wheeler*, for the Ibis.

*C. T. Russell* and *W. E. Russell*, for the Henry Warner.

*W. W. Dodge*, for the Insurance Companies.

NELSON, J. This case was a libel by the owners of the bark Ibis, against the barquentine Henry Warner and her freight, for collision. The China Mutual Insurance Company and the Atlantic Mutual Insurance Company, who were the underwriters of the cargo of the Ibis, consisting of 1,299 bales of cotton, lost in the collision, and who have paid the loss, also intervened for their own interest, and prayed that the damages decreed against the Henry Warner should be paid to them.

The collision occurred on the evening of January 6, 1886, on the Nantucket shoals, about half way, and nearly on a direct line, between the Handkerchief and the Shovelful light-ships. The Ibis was on a voyage from Galveston to Boston. Off Holmes Hole she took a pilot, and, continuing on her course, rounded the Handkerchief light-ship between 4:30 and 5 P. M. At 5:30 P. M., when half way between that light-ship and the Shovelful light-ship, she dropped her anchor, furled her sails, and set an anchor light in the starboard fore rigging. She continued lying at anchor in that position until the collision.

The Warner was on a voyage from Buenos Ayres to Boston. After rounding the Handkerchief, the wind being N. W. and favorable, her course was laid directly for the Shovelful light. Nothing was seen or heard of the Ibis by the lookout, or by any one on the deck of the Warner, until the two vessels were within two or three ship's lengths apart, and until it was too late to do anything to prevent the collision; and at 7 o'clock, or a little later, the Warner ran into the Ibis, striking her on the port bow, a little forward of the cat-heads, and cutting her down

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

to the water's edge. The Ibis floated until the next morning, when she was abandoned by her crew, and soon after sunk. The Warner lost her anchor and all her head-gear. The latter continued on her course after the accident, and succeeded in passing the shoals, but, owing to the loss of her head-sails and anchor, was driven off the coast, and did not arrive in Boston until the 14th.

It is insisted on the part of the Warner that the evidence fails to show that at and immediately before the collision, the anchor light of the Ibis was up and burning; or, if it was, that it was not the powerful eight-inch globular lantern required by the sailing regulations, but was one of inferior capacity. It must be admitted that some of the circumstances of the case tend strongly to support this view. The evening, though dark, was perfectly clear. The second mate and another seaman were on the lookout forward on the Warner, and the master was on deck in charge, and was keeping a lookout ahead with his night glass. Yet none of them saw the light on the Ibis. It is agreed that the light was out immediately after the collision, while the vessels were in contact. The lantern was not produced in court. The master of the Ibis testified that it was left hanging in the rigging, and went down with the vessel. But a diver, who examined the wreck on the bottom a few days afterwards, searched for it, but did not find it. On the other hand, the master of the Ibis, the pilot, the two mates, the men in the watch, and all the other men on board who were in a position to observe, swear with great positiveness that they saw the lantern burning brightly and clearly in the rigging as the Warner approached. All describe it as the regulation eight-inch globular lantern. The mate's account of it is somewhat confused, but not sufficiently so to throw discredit on the others. When taken down after the collision, the top was found to be broken in, but the glass was uninjured. It was repaired with canvas, and again lighted and set, and continued to burn until the vessel went down. The master of another vessel which lay by the Ibis during the night saw it, and describes it as the usual regulation light. The light was also seen by the men in charge of the Handkerchief and Shovelful light-ships, two miles off, for some time before the collision, and as late as 7 o'clock.

With all this evidence before me, I find it impossible to come to any other conclusion than that a proper anchor light was set and burning on the Ibis. That being so, the Warner was bound at her peril to see it, and avoid the vessel at anchor. It is certainly more likely that the men on the Warner failed to see it through inattention, or by confusing it with the lights of the numerous light-houses and light-ships to the eastward, than that so many witnesses should be guilty of the grossest falsification, as they undoubtedly must be if the light was not there. The lantern must have been put out in the collision, but whether by the jib-boom of the Warner, as the libelants claim, or by the concussion, or in some other way, it is impossible to say. The shroud on which it was hung was found broken by the diver. The dent in the top shows a blow of some sort. What happened to it at the bottom of the ocean, must, of course, remain a mystery.

The claimants of the Warner also object that the Ibis was anchored in an improper place, and that the collision was also due to that cause. But there was no want of room for vessels to pass on both sides of her. The channel for ships at that place is a mile and a half wide. The reason given by the master and pilot for anchoring here is that the wind was N. W., and increasing, and the vessel, being loaded with cotton, was high out of the water, and they thought there was danger that she might be blown off the coast after passing the shoals. But whether this showed good seamanship or not is immaterial. The place was the open ocean, which is free to all for anchoring as well as for sailing, with this limitation: that the anchoring vessel is under obligation to observe the usual and prescribed precautions to notify her position to other vessels.

The remaining question is whether the Ibis used such precautions. She was brought up in a place where vessels were frequently passing, and where the navigation was difficult and dangerous. It was therefore incumbent on her to exercise especial vigilance and care to give warning of her presence to passing vessels. The starboard watch, consisting of the second mate and three hands, was on deck from half past 6. But no anchor watch was set, and no lookout kept. The watch were collected under the lee of the forward house, and, though this was the side on which the Warner approached, they saw nothing of her lights until she was within two or three lengths, when they might and should have seen them soon after the Warner rounded the Handkerchief. Her own light was seen two miles off by the men on the light-ships. With half a minute's earlier warning, the Warner would have gone clear. Situated as she was, it was her plain duty to have, in addition to her anchor light, a good lookout kept. There can be little doubt that an earlier hail than was given would have attracted the attention of the men on the Warner, and, had the latter's wheel been put down a moment sooner, the Ibis would have escaped wholly, or with the loss of her head-gear only. For her failure to keep a lookout the Ibis must also be held to blame.

The case was also heard on the petition of eight seamen, constituting the crew of the Warner, for the payment of their wages earned on this voyage out of the proceeds in the registry of the court. A petition was also presented by a firm of stevedores for the payment of their bill for discharging the cargo at Boston. It appeared that all these claims had been assigned to Mr. Gore, the average adjuster, who advanced the money for their payment. The amount advanced to the seamen has already been repaid to him by the firm of N. W. Rice & Co., of Boston, and Mr. Gore testified that he expected repayment of the sum advanced to the stevedores from the same source. I have no doubt that, by this time, this has also been repaid. I think the evidence indicates, with sufficient certainty, that these claims were really paid in the interest of the owners of the Warner, and that the assignments were taken with the object of keeping alive whatever lien the petitioners might have for their payment, as against the owners of the Ibis and her cargo. They should therefore be treated as actually paid, and any lien on account of them

that may have once attached to the vessel and freight as already discharged.

The petitions will be dismissed.

The decree for the owners of the Ibis will be for divided damages, and for the insurance companies, as representing the cargo-owners, for full damages. Ordered accordingly.